## Richmond

### ROSE ELLA YARBOROUGH V. COMMONWEALTH OF VIRGINIA.

April 22, 1977.

Record No. 760761.

Present, All the Justices.

*Alvin B. Fox (R. Rick Reiss; Ellenson, Fox and Wittan, Inc.* on brief), for plaintiff in error.

*Jim L. Chin, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

COMPTON, J., delivered the opinion of the court.

Upon an indictment for the murder of Charles Augusta Vines,

defendant Rose Ella Yarborough was convicted by the trial court, sitting without a jury, of voluntary manslaughter and sentenced to confinement in the penitentiary for a term of five years. The writ of error awarded defendant to the March 2, 1976 judgment of conviction presents issues dealing with: (1) admissibility of certain incriminating statements made by the defendant, when intoxicated, during a custodial interrogation; and (2) application by the court below of the doctrine of excusable homicide in self-defense. We find no reversible error and affirm.

The facts are not in dispute. On September 11, 1975 near 6:30 p.m., defendant and Vines appeared at the back door of the residence of Rosa Lee McNeill, defendant's sister-in-law, located in the City of Newport News. McNeill refused to admit them to her home because they "had been drinking" and were "arguing." Thereafter, the couple remained on McNeill's back porch for about 35 minutes and continued to argue. Then McNeill, who had stayed within her home watching television, heard the sound of gunfire outside. She went to her back door, saw Vines "laying on the ground", and determined he had been shot.

Defendant, testifying as the only defense witness, said Vines had been her "boyfriend" for about seven years. She stated that during the period of their relationship they had argued and that Vines had been "violent" to her. She testified that on prior occasions, he had "shot me with a sawed off shotgun, shot half of my breast off and I had a hole in my arm", all resulting in three separate operations. She also said that in the past defendant "throwed me down the steps one time and broke my shoulder."

Testifying about the event in question, defendant said that shortly before the shooting, she and Vines, both of whom had been drinking intoxicating beverages, were together at her mother's house, located near McNeill's home, when Vines gave her a loaded .22 caliber revolver. At the time, according to defendant, Vines "said he wanted [the gun] for protection" — "protection" of whom being unclear from the record.

Defendant further testified the couple then went to McNeill's back porch where Vines "got to arguing" with her. When the argument continued, Vines became "nasty" and "violent". Finally, Vines "knocked" defendant from McNeill's back porch into some nearby bushes. She then "shoved" him "back in the bushes" and then he "knocked" her to the ground and again into

the shrubbery. As defendant "tried to get up," Vines, who was then close to defendant, reached down toward a boot he was wearing. Defendant knew he was carrying a 14-inch long-bladed knife in the boot so, as his hand was "a little past his knee", she pulled the revolver from her "bosom" and shot him. Vines, who later died from one gunshot wound of the chest, never drew the knife.

Defendant testified: "I didn't intend to shoot him; I tried to get him off of me because I knew when he was drunk he was violent." Asked whether at the time she fired the weapon she was able to "retreat anywhere", defendant said "I was — at that time . . . in the hedges; at that time it was thick." Defendant stated she shot Vines without asking him not to use the knife because she was "scared of him" and because she knew he would not heed her request; she said that when Vines shot her with the shotgun on the prior occasion, she first pleaded with him not to fire.

Leaving Vines lying on the ground, defendant ran to her mother's home and hid the revolver under a mattress. She then "ran around the block", because she was "excited", and eventually returned to the scene. In the meantime, Vines had been removed from the area by ambulance and the police had arrived to investigate. When defendant returned, she approached the officers who, by then, suspected defendant "was involved" in the crime. After being given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and being told she would be charged with murder if Vines died, defendant stated "I shot him." She then led one of the officers to the room where the revolver was hidden and identified it as being the weapon she used to shoot Vines.

■ Defendant first contends the evidence shows she was "heavily intoxicated" when given the *Miranda* warnings and when she made the foregoing inculpatory statements. She argues that, accordingly, the trial court erred by receiving such statements in evidence through the testimony of one of the investigating officers because, as the result of her intoxication, defendant lacked the capacity to knowingly and intelligently waive her privilege against self-incrimination and her right to the assistance of counsel. The pertinent law as applied to this evidence fails to support this contention.

Two of the investigating officers testified and stated the defendant was "intoxicated" at the scene. These opinions were based on their observations of defendant's "mannerism and the way she was talking." The officers smelled the odor of liquor on defendant's person and testified she was "staggering about" and "constantly weeping." But at trial defendant said she "had been drinking a little bit ... not much, though" immediately preceding the shooting. She further stated she knew "what was happening" and "going on" at the time she was warned and when she discussed the shooting with the police.

Statements made during a custodial interrogation and while intoxicated are not *per se* involuntary or inadmissible. *United States* v. *Brown,* 535 F.2d 424, 427 (8th Cir. 1976). The test is whether, by reason of the intoxication, the defendant's "will was overborne" or whether the statements were the "product of a rational intellect and a free will." *Townsend* v. *Sain,* 372 U.S. 293, 307 (1963). In this case, the evidence fully supports the trial court's ruling that defendant made a knowing and intelligent waiver of her *Miranda* rights and that the statements were voluntary. The defendant testified she had been "drinking" only "a little bit" just before the events in question and that she understood "what was going on" at the time. Moreover, her conduct immediately after the shooting, and during the ensuing investigation, demonstrates she was not too intoxicated to understand and appreciate the *Miranda* warnings. For example, she immediately went to her mother's home after the shooting and secreted the pistol; she voluntarily returned to the scene and reported to the police officers; she led an investigator to the place where the revolver was hidden; and she identified the gun to the officer as the murder weapon. Clearly, the defendant's will was not "overborne" and her statements were the "product of a rational intellect and a free will." *See United States* v. *Cox,* 509 F.2d 390, 392 (D.C. Cir. 1974); *Fant* v. *Peyton,* 303 F.Supp. 457 (W.D. Va. 1969).

■ Defendant next contends the trial court "erred as a matter of law in ignoring the theory of excusable homicide in self-defense and in precluding the defendant from relying upon such defense." She points to certain comments made during the trial by the court below and interprets them to mean the court improperly refused to consider the foregoing defense when, under the evidence, the defendant was entitled to rely thereon.

Actually, defendant's argument reaches farther than the above-stated position which, if sustained, would warrant a reversal and remand; she seeks a judgment here of acquittal as a matter of law, not a new trial, contending the "evidence is sufficient to sustain her plea of excusable homicide *se defendendo*."

Killing in self-defense may be either justifiable or excusable homicide. "Justifiable homicide in self-defense occurs where a person, without any fault on his part in provoking or bringing on the difficulty, kills another under reasonable apprehension of death or great bodily harm to himself." *Bailey* v. *Commonwealth*, 200 Va. 92, 96, 104 S.E.2d 28, 31 (1958); *Dodson* v. *Commonwealth*, 159 Va. 976, 167 S.E. 260 (1933). "Excusable homicide in self-defense occurs where the accused, although in some fault in the first instance in provoking or bringing on the difficulty, when attacked retreats as far as possible, announces his desire for peace, and kills his adversary from a reasonably apparent necessity to preserve his own life or save himself from great bodily harm." 200 Va. at 96, 104 S.E.2d at 31. But bare fear that a person intends to inflict serious bodily injury on the accused, however well-grounded, unaccompanied by any overt act indicating such intention, will not warrant killing such person. *Harper* v. *Commonwealth*, 196 Va. 723, 731, 85 S.E.2d 249, 254 (1955).

With these principles in mind, we now turn to the comments of the trial judge which defendant contends demonstrate the court below refused to apply the doctrine of excusable homicide. But we will not set forth the trial court's comments out of the context in which they were made, so far as we are able to ascertain that context from the transcript, which contains only excerpts from the colloquy between court and counsel, and which does not fully set forth the arguments on the law of the case of either the prosecutor or defense counsel. We will italicize the court's comments which are singled out and relied on by defendant to sustain her position.

The Commonwealth's case-in-chief was presented through the testimony of two of the investigating officers and McNeill, who stated defendant told her the killing was in "self-defense or something." At the conclusion of this evidence the following transpired:

"MR. OLSON [prosecutor]: That's the Commonwealth's case, your Honor.

"COURT: The Commonwealth rests.

"MR. FOX [attorney for defendant]: Move to strike, Judge. The Commonwealth has brought out the evidence we would bring out. It was a case of self-defense. We don't know what happened there. Other than the fact that this man —

"COURT: Where is the self-defense? Where is any evidence of self-defense?

"MR. FOX: The Commonwealth has brought that out.

"COURT: I must have missed it.

"MR. FOX: From the witness McNeill as to what happened, and she said [defendant] told her as to the circumstances of the shooting. We admit from the evidence that we are the one who fired the gun, but the Commonwealth hasn't brought out the reason, other than the fact of our statement that it was self-defense.

"COURT: It takes more than a statement of self-defense. It takes more than that. That's a conclusion.

"MR. FOX: Yes sir, we'll put on the evidence."

The defendant then testified and rested her case. No evidence in rebuttal was offered by the Commonwealth. Then, according to the record, each counsel presented his closing argument to the court, neither of which was transcribed. But the record does contain a transcript of the following colloquy which occured during the argument of defendant's attorney:

"MR. FOX: Judge, if we subscribe to that theory, I would be representing a corpse today, with what this man's record was. I don't know.

"COURT: *I'm surprised — a little surprised that the Commonwealth is willing to talk about manslaughter. Here this woman going with that man who had broken her shoulder, shot her breast off with a shotgun, one time or another. She said she's scared of him. Yet, she continued to go with him. Armed herself. And then she gets in an argument with him and shoots him. I don't — looks like to me, Mr. Fox, she put herself in that position. Frankly.*

"I don't see any self-defense in this matter. I really don't. He never pulled the gun; she said he was going for it. Maybe he

was. He never pulled it. I think she's guilty of manslaughter too.

"MR. FOX: What more did she have to do under these circumstances with what this man did for her?

"COURT: *In the first place, she had no business arming herself and being — and going in volatile company where this man had shot her once, broken her shoulder once. She's got no business to do that, and then arm herself to protect herself.*

"MR. FOX: She didn't arm herself. The evidence ought to be brought out from the Police Department this was this man's gun. He gave it to her.

"COURT: She had the gun.

"MR. FOX: He gave it — he had the bullets on him.

"COURT: I think she's guilty — I really think she's guilty of second degree murder, but I'm going to find her guilty of voluntary manslaughter."

During the March 2, 1976 sentencing hearing, held about one month after the trial, the record shows that after the pre-sentence report had been discussed, counsel again presented argument to the court. This argument has also been omitted from the record, however the transcript does contain the following statements made by the trial judge:

"COURT: This man was — that the deceased was not a paragon of virtue, of course, is shown by the evidence. And assuming everything is true that this woman said about how this man had mistreated her and that he had maimed her in the past and attempted to kill her on occasion, or on, maybe, several occasions, let's assume that all of that is absolutely gospel just as it came from her mouth.

"She isn't charged with carrying on an affair with the man who was disposed to violence. That's not the charge. What she did was she went with the man, whom she knew was disposed to violence, armed herself, and became voluntarily intoxicated at the same time. And she killed him, and from the — the physical evidence at least, he was armed too, but he had not drawn his weapon, according to the physical evidence. The weapon was in his sock when he was admitted to the hospital.

"And — I say that the word has got to go out that people can't arm themselves and place themselves in the position

where they — voluntarily, where they can expect violence to erupt and then claim self-defense. You just cannot do that.

"And — I recognize that this woman would probably never be a threat to anyone on the street, but that doesn't give her the right to take someone's life because she would never take another one."

The defendant contends the italicized language demonstrates conclusively "the trial court erroneously instructed itself" and that the trial judge "misapprehended the standard against which the Defendant's conduct is to be measured." We disagree.

■ Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts. Furthermore, we will not fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied. In this case, taking the foregoing comments as a whole, we construe the trial judge's statements as furnishing alternative bases, one correct and one erroneous, for his finding of defendant's guilt.

On the one hand, he clearly, and correctly, made a finding of fact that the defense of self-defense had not been sustained by the evidence. Such was the obvious import of his comment in response to defendant's motion to strike made at the conclusion of the Commonwealth's case-in-chief when he said, in effect, that more than a conclusory statement is necessary to furnish a factual basis for self-defense. And then during the colloquy following the closing arguments on the day of trial, the court said: "I don't see any self-defense in this matter. I really don't. He never pulled the gun." This train of thought continued to the sentencing hearing when the court observed Vines "had not drawn his weapon." The clear meaning of these latter comments is that, factually, the plea of excusable homicide in self-defense had not been sustained because the vital element of a "reasonably apparent necessity" to kill did not exist. Stated another way, the court either decided not to believe all the defendant said, as it had a perfect right to do, or it held, as a matter of fact, that Vines' mere reaching down toward his boot was not such an overt act indicative of his intention to kill or do great bodily harm to defendant as would excuse the homicide. In

essence, whether or not defendant showed such circumstances of excuse to create a reasonable doubt that she acted in self-defense was an issue of fact. That being the case, we cannot say a judgment of conviction having the foregoing factual basis "is plainly wrong or without evidence to support it." Code § 8-491.

On the other hand, many of the trial judge's comments, *supra,* tend to show he concluded the defendant, as a matter of law, was not entitled to rely upon a plea of self-defense. The court apparently focused, in part, on the inapplicable doctrine of justifiable homicide only, as indicated by repeated references to defendant's fault, and may have ignored, at times, the applicable doctrine of excusable homicide. But, at the most, such an interpretation, if correct, of what the trial judge may have believed was the relevant law merely furnishes an alternative, albeit incorrect, basis for his judgment. The fact remains, as we have said, it is clear he considered the proper doctrine of excusable homicide. So where, as here, we can be satisfied the conviction was based on a correct application of the law, we will not reverse the judgment, even though an incorrect theory may also have been considered by the court.

For these reasons, the judgment of conviction will be

*Affirmed.*