## CIRCUIT COURT OF ARLINGTON COUNTY

Commonwealth of Virginia

· v.

Daniel Robert Kfoury

May 23, 1986

Case No. C-24300

By JUDGE PAUL F. SHERIDAN

The Court has reviewed the legal authorities governing the admissibility of statements to police by suspects in criminal cases and has reread certain cases after the very helpful oral arguments. In essence, able counsel for the defendant would have the Court find that Daniel Kfoury suffered from such a degree of mental illness that Kfoury was incapable of making "free and voluntary" choices in regard to Kfoury's decision to speak to the police and/or in regard to Kfoury's waiver of his right to silence. Despite some expert testimony suggesting that Daniel Kfoury indeed was suffering from a schizo-affective disorder at the pertinent times, and despite the disturbing nature of the contents of Kfoury's statements, the Court concludes that the Commonwealth has carried its burden of proving that, considering all the circumstances, Daniel Kfoury had sufficient capacity to comprehend his rights, the nature of the acts he described, and the factual and legal framework in which he was talking to the police that defendant's motion to suppress statements made by Daniel Kfoury should be denied. Use by the Commonwealth of all statements made by Daniel Kfoury in the aftermath of the death of Robert Bloom is constitutionally permissible, in light of the totality of circumstances described in open Court. In so deciding this Court has evaluated the demeanor, intellectual state, coherency, and general state of mind of

Daniel Kfoury as displayed in a videotape of almost two hours duration taken within less than half a day after Bloom's death.

This decision also is based upon factors used in deciding the earlier motion regarding Kfoury's competency to stand trial. There was no testimony that Kfoury's psychiatric condition differs today from what it was when he made these statements. During cross-examination of defense Psychiatrist Doctor Park Dietz, the Commonwealth Attorney elicited specific matters that Kfoury could understand. A summary of all those understood elements is that Kfoury perceived that his acts might be viewed as criminal by the police to whom he spoke, and that Kfoury could understand the nature of criminal proceedings. Doctor Dietz conceded that it was difficult to distinguish the cause of Kfoury's decision to talk, as either divinely compelled or simply the product of normal conscious guilt. Although there was psychiatric testimony from experts that Kfoury talked involuntarily and without the capacity for volitionally choosing silence over speech, the Court concludes that Kfoury did make discrete choices throughout the pertinent times that compel the factual conclusion that Kfoury could, and did, freely and voluntarily choose to speak.

Kfoury's initial telephone call to the police reporting a death, a tape recording of which was placed in evidence, reflects a calm tone of voice, a rational reaction to questions asked of him, and a specific awareness by Daniel Kfoury that his description of how that death occurred might amount to a confession. Regardless of other evidence suggesting that Daniel Kfoury believed only that he carried out a mission from God to drive demons from the deceased, that brief telephone message and his subsequent discussions indicate that Daniel Kfoury clearly perceived that police, as well as other persons, could view Bloom's death as the result of a criminal act.

In regard to Daniel Kfoury's statement at or near the scene of Bloom's death to police agent Robert MacFarlane, it is permissible for police to inquire at the scene of a crime as to basic elements as to what happened. The questions by MacFarlane did not exceed constitutionally permissible limits. See generally *Waye v. Commonwealth*, 219 Va. 683 (1979).

Evidence established that police officer Gary Davis drove Daniel Kfoury from the scene of Bloom's death,

in a ride lasting approximately ten minutes, to the Arlington County Police Station. In spite of Arlington County Police policy that criminal suspects be handcuffed and body-searched prior to transportation in a police car, Kfoury was not handcuffed and was not subjected to a body-search. Despite Kfoury's statements up to that point that he had been "wrestling" with the deceased Bloom, and despite the physical evidence present in the rooms where that "wrestling" had occurred, the police were not compelled to then conclude that Kfoury's description was correct. Because of the bizarre nature of what Kfoury described to each person who would listen to him, the officers acted reasonably and without any violation of Kfoury's constitutional rights in continuing to keep an open mind as to the accuracy or conclusive nature of Kfoury's statements. *California v. Beheler*, 103 S.Ct. 3517 (1983).

At the police station, Daniel Kfoury was advised several times of his *Miranda* rights. The psychiatric testimony of Dr. Park Dietz, considered along with the police officers' impressions that Kfoury understood what they were saying and what was going on, and Kfoury's videotaped demeanor and statements led to this Court's factual findings that Kfoury understood his right to silence, understood that the police were viewing the matter as potentially criminal in nature, and understood his *Miranda* rights.

There was psychiatric testimony tending to establish that one element of Kfoury's alleged mental incapacity was "pressured speech." In lay terms "pressured speech" would mean that Kfoury could not rationally resist a divinely compelled need and/or desire to speak openly and verbosely about the events surrounding Bloom's death. Dr. Park Dietz, testifying in open Court, opined that his emphasis on Kfoury's "pressured speech" symptom was frankly diluted by Dr. Dietz's observation of Kfoury's ability to sit silently and to demonstrate appropriate control over himself during that portion of the courtroom proceedings observed by Dr. Dietz.

It is suggested in psychiatrists' opinions that Kfoury, either from an inner religious need or from simply a guilty conscience over the death of Bloom, was going to talk to anyone he met about what had happened. There is no evidence the police used coercion, suggestion or misconduct in regard to their listening to, and/or treat-

ment of, Kfoury. The authorities reviewed by this Court in trying to decide suppression issues have reflected some police conduct depriving a suspect of his rights. Here, we have no police misconduct causing Kfoury to forfeit his rights or to give statements.

Police investigating a crime do not have a duty to stop a suspect from talking. *Miranda v. State of Arizona*, 86 S.Ct. 1602, 1630 (1966). Thus, defendant's motion to suppress, if it is to prevail, rests exclusively on the position that Kfoury's psychiatric state prevented Kfoury from freely and voluntarily choosing what to do in regard to silence or speaking. Able counsel for Kfoury relies on many cases, tending to support Kfoury's view that his "mental illness" made him virtually unaware of his *Miranda* rights. One case relied upon, however, rebuts the concept that mental illness alone is sufficient to suppress confessions. In *Blackburn v. Alabama*, 361 U.S. 218, 80 S.Ct. 274 (1960), a criminal suspect had been declared by the Veterans Administration to be 100% psychiatrically disabled, and was adjudicated in a state court proceeding to be totally incompetent. That defendant escaped from a mental institution to commit a crime, and "confessed" after sustained police interrogation. This Court has found no clearer opportunity for the Supreme Court of the United States to rule that mental illness alone eliminates that "free and voluntary" state of mind necessary for a criminal suspect to intelligently and rationally waive his right to silence. The Supreme Court, in *Blackburn*, refused to so rule. The *Blackburn* opinion stands as strongly as any case read by this Court for the proposition that the subjective mental condition of the suspect is just one circumstance to be considered in the "totality" of circumstances.

In *Townsend v. Sain*, 83 S.Ct. 745, 754-55 (1963), certain language has been urged by Kfoury's counsel as compelling suppression here. But the Court reads that cited language to require placement into broader context. In *Townsend*, the Supreme Court of the United States was actually addressing a confession that followed injection of a so-called "truth serum" into a defendant, after that defendant had resisted confessing for many hours. If the Court interprets correctly the *Townsend* statement that "if an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because

coerced," then, contextually, it means that the overbearing of that defendant's will was "coerced" by constitutionally impermissible police conduct. Supporting that interpretation of *Townsend* is the next sentence in the same opinion which makes it clear that the Supreme Court of the United States was considering a confession that was the product of police-caused "physical intimidation or psychological pressure."

Counsel for Kfoury would have the Court decide that Kfoury's "mental illness" was so overpowering of Kfoury's rationality that his free will and power of volitional choice were totally nullified. But the totality of the evidence rebuts such argument. Daniel Kfoury is an adult of approximately 30 years of age with a college graduate level of education. He did not use alcohol or drugs at any time. He demonstrated in all courtroom appearances as well as in his videotaped statement appropriate social interchanges and intellectual awareness of everything going on around him. This Court finds that any symptoms described by psychiatric experts and diagnosed by them to amount to mental illness fall far short of the degree of psychiatric incapacity required to sustain Kfoury's position that he totally lacked free will and rational capacity for choice. In *Yarborough v. Commonwealth*, 217 Va. 971 (1977), the Supreme Court of Virginia made it clear that a criminal suspect does not have to be a paragon of mental acuity in order to freely and voluntarily elect to talk to police. In *Yarborough*, the defendant who made incriminating statements was alleged to have been "heavily intoxicated when given *Miranda* warnings and that as a result of such intoxication she lacked the capacity to knowingly and intelligently waive her privilege against self-incrimination and her right to the assistance of counsel." The Supreme Court of Virginia sustained the trial judge's conclusion that the defendant "was not too intoxicated to understand and appreciate the *Miranda* warnings." The Court finds here that Kfoury was not so impaired in his mental capacities as to justify a factual conclusion that Kfoury could not, and did not, understand and appreciate his right to silence.

Thus, the Court concludes that Daniel Kfoury's will was not overborne by either police misconduct or mental illness at the times of his statements to the police. Further, the Court concludes that Daniel Kfoury's statements,

and his decisions to make those statements, were the product of a rational intellect and a free will.

Having found neither police misconduct nor police acts or omissions that were "causal" in nature regarding Kfoury's decision to give statements, and having found Daniel Kfoury did have and did exercise sufficient mental competency as to freely and voluntarily elect to make his statements, the Court denies defendant Kfoury's motion to suppress.

Since the previous ruling that Kfoury is competent to stand trial, and this denial of Kfoury's motion to suppress statements have been adjudicated, the Court is prepared to set the case for trial.