COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Willis and Bray
Argued at Norfolk, Virginia


EUGENE LAMONT OWENS

MEMORANDUM OPINION[*] BY
v.  Record No. 0647-93-1          JUDGE JAMES W. BENTON, JR.
                                          JUNE 27, 1995
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                 John C. Morrison, Jr., Judge

          Robert D. Eisen for appellant.

          Kathleen B. Martin, Assistant Attorney General
          (James S. Gilmore, III, Attorney General;
          Donald R. Curry, Senior Assistant Attorney
          General, on brief), for appellee.



     Eugene Lamont Owens was convicted of second degree murder,
robbery, and two offenses of use of a firearm in commission of a
felony.  Owens contends that the trial judge erred in failing to
suppress statements he made after his arrest.  We affirm the
convictions.

                              I.

     Prior to trial, Owens' counsel filed a motion to suppress
"statements . . . taken in violation of [Owens'] Fifth Amendment
rights."  At the evidentiary hearing, Detective Shaun Squyres
testified concerning the circumstances surrounding his interviews
with Owens following Owens' arrest for the killing of Andrew
Green.  Squyres testified that he was told that Rodolfo Cejas, an
attorney, was in the police station on February 19, shortly after

───────────────
     [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

Owens had been brought into the station.  Squyres said that he was not informed that the attorney requested to see Owens.  The record contained no testimony by Cejas that he had been retained by Owens or requested to see Owens.

Squyres advised Owens of his <u>Miranda</u> rights at 9:52 a.m. Owens stated that he understood those rights and responded to Squyres' questions.  Owens initially denied being present when Green was killed.  As Squyres questioned him further, Owens stated that he was in the vicinity of the event, heard the shots, but did not rob or kill Green.  Owens said that he had purchased wine and heroin the night of the shooting.

Squyres acknowledged that if Owens had used drugs and consumed alcohol the night before the interview, he could have been intoxicated during the interview.  Squyres testified, however, that nothing about Owens' behavior indicated that he was intoxicated.  Moreover, Squyres said he had known Owens for a long time and Owens "wasn't acting any different than any other time that I had ever seen [him] on any occasion."

At 1:14 p.m. following the initial interview, Squyres again spoke to Owens.  Squyres testified that he stopped the conversation when Owens said "I want to talk to my lawyer." Owens was then taken to a holding cell in the police station. Squyres testified that Owens began pounding on the door later that day and asked to speak with Squyres.  When Squyres again met with Owens at 3:50 p.m., Owens told Squyres that he wanted to

tell the truth.  Owens then told Squyres that he took several men to Green's house to rob Green.  Owens described an exchange of gunfire in which Green and another man shot and killed themselves.  Owens denied having a gun or shooting during the robbery.

Squyres testified that the day after those interviews Owens' friend, Kim Baldwin, made a telephone call to him.  Baldwin initiated a conference call in which they spoke with Owens from the jail.  After Squyres gave Owens Miranda warnings, Owens told Squyres where the guns were hidden.  Owens again denied that he was armed during the robbery.

Squyres testified that on February 21, Owens called again from jail and said he wanted to talk to Squyres.  Squyres had Owens transported to the police station.  After Squyres gave Owens Miranda warnings, Owens provided more detail regarding the robbery of Green and admitted his involvement in the robbery.  However, he continued to deny that he was armed.  When Owens refused to repeat the statements on audio tape, Squyres ended the interview.  On February 22, Owens called Squyres from the jail and said he would allow the statement to be recorded.  Squyres testified that he refused to meet Owens and told Owens to contact him through Owens' attorney.

Squyres testified that seven months later, following a proceeding involving Owens' co-defendants, Baldwin called to tell Squyres that Owens wanted to talk to him.  On September 22,

Squyres arranged an interview with Owens at the police station and again advised Owens of his <u>Miranda</u> rights. Squyres said that Owens was angry because a witness had recanted statements concerning the crimes and the prosecutor had decided not to prosecute two co-defendants who had been charged. Owens wanted to give a statement because "he didn't want to take the weight . . . by himself." Owens gave a statement that was consistent with his last prior statement except that he admitted being armed at the time of the robbery. The statement was detailed and included a description of the participation of the two co-defendants who had been released from jail. This statement was recorded.

Squyres testified that Owens told him that Baldwin could confirm many of his statements. Squyres told Owens that it was important that Baldwin talk to him since "she was the source of this conversation about these deals being made to change stories on cases." Owens told Squyres that Baldwin would speak to Squyres if Owens told her to.

Squyres testified that two days later he brought Baldwin to the police station. Squyres spoke to Baldwin alone and taped her statements. Squyres testified that while he was recording Baldwin's statement, Owens was in another room reading his typed statement.

Squyres testified that after he obtained Owens' and Baldwin's signatures on their respective statements, he brought

Owens and Baldwin together in the same room to speak with them about their statements. Squyres said that after talking to them he left the room, locked the door, and went to check his records to verify their story. Squyres testified that after three minutes, he returned and "checked on them." He again left the room, "search[ed] information, answered a couple [of] phone calls, and, eight or ten minutes later, . . . stepped back in the room and . . . told them to say good-by." Squyres testified that he had not made any promises to Owens and had not threatened him.

Owens and Baldwin testified at the hearing and contradicted Squyres' testimony in several respects. Owens testified that when Squyres read Miranda rights to him on the morning of his arrest, he told Squyres that he was intoxicated and wanted to talk to his lawyer. Owens testified that prior to his arrest he had been drinking and had used heroin. Owens also testified that he could not remember what he told Squyres that day because of his intoxication.

Owens also testified that in September Baldwin told him that Squyres wanted to talk to him. When he contacted Squyres, Squyres was angry about the release of two co-defendants. Squyres asked Owens if he wanted to see Baldwin. Owens testified that when he answered affirmatively, Squyres told him what he expected him to say. Owens said that Squyres recorded his statement and erased the tape whenever he said something incorrectly. He said that after he completed his statement,

Squyres told him that "I am going to get [Baldwin] down here and see what she knows about the case and I'm going to let you be with her . . . I know you've been incarcerated a long time.  I know you'd like to be with your wife."  Owens said he understood that statement to mean that Squyres would allow him to have sexual intercourse with Baldwin.

He testified that Squyres gave him the typed statement to read the next day when Baldwin was in the police station.  He testified that he signed the statement only after he had sexual intercourse with Baldwin.  Owens testified that the statement was false and that he only gave the statement because of the promise of sexual intercourse.

Baldwin testified that she called Squyres several times when Owens was in jail, and she participated in conference calls with Owens and Squyres.  She did so because Owens wanted to talk to Squyres.  Baldwin testified that Squyres called her in September to say he wanted "to get everything straight about this case" and asked her if she wanted to see Owens.  Squyres picked her up at 9 p.m., took her to the police station, and entered through the back door.  When she entered the interrogation room, she saw Owens reading something that appeared to be a typed statement.  Squyres took her into another room, where they talked.  She testified that she did not know why the witness changed his story, and that she told Squyres what she had heard.  She testified that Squyres then took her to Owens, said to her,

- 6 -

"Don't do nothing nasty," and left the room.  She and Owens then had sexual intercourse in the room.  A half hour later, Squyres returned to the room, asked no further questions, and took her home.

II.

Owens contends that any statements he made to the police were involuntary and taken in violation of his Fifth Amendment rights. The Commonwealth argues that Owens' counsel waived any claim regarding the admissibility of his statements to the police. We disagree that the issue was not preserved for appeal. At trial when the prosecutor offered in evidence the statements the judge had refused to suppress, Owens' counsel stated, "We will stipulate [Owens] was properly Mirandized. We have no problem with the statements." We conclude that Owens' counsel conceded only that the police properly warned Owens of his Miranda rights. The trial judge had already ruled at the suppression hearing that Owens had failed to prove that his statements were involuntary because he was intoxicated and induced by sex. Counsel's statement at trial merely conceded the propriety of the Miranda warnings. Counsel did not waive the involuntary issue that was raised at the suppression hearing.

Even where a suspect has been advised of rights as required by Miranda v. Arizona, 384 U.S. 436, 475-76 (1966), and has made a statement, see Mincey v. Arizona, 437 U.S. 385, 396-97 (1978), that statement is inadmissible if it was made involuntarily. Id. at 402. See also Miller v. Fenton, 474 U.S. 104, 110 (1985). Whether a statement is voluntary is a legal determination rather than a factual question. See id. The test to determine voluntariness is whether the statement is "the product of an

- 8 -

essentially free and unconstrained choice by its maker" or whether the maker's "will has been overborne and his capacity for self-determination critically impaired."  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).  To determine whether an accused's will has been overborne, this Court must look to "the totality of all the surrounding circumstances."  Id. at 226.

No evidence in the record supports Owens' claim that the statements he made when he was first questioned were involuntary.  Owens testified that he was intoxicated.  However, Squyres testified that Owens did not show any signs of intoxication.

> Statements made during a custodial interrogation and while intoxicated are not per se involuntary or inadmissible.  The test is whether, by reason of the intoxication, the defendant's "will was overborne" or whether the statements were the "product of a rational intellect and a free will."

Yarborough v. Commonwealth, 217 Va. 971, 974, 234 S.E.2d 286, 289 (1977) (citations omitted).  Nothing in the record supports a claim by Owens that he was intoxicated to the degree that his will was overborne or that he was not capable of making a free and rational decision when he waived his right to remain silent and spoke to the police officer.  Owens' mere statement that he was intoxicated was not sufficient to prove that his waiver was involuntary.  Id.

### III.

Owens further argues that his Fifth Amendment rights against self-incrimination were violated because Squyres induced Owens to

confess with a promise of sexual contact with his friend, Kim Baldwin.  Squyres testified that Owens gave a recorded statement prior to any mention of a meeting with Baldwin.  Owens testified that before he gave a statement Squyres asked him if he wanted to "see [Baldwin]."  According to Owens' testimony, however, it was only after the statement was recorded did Squyres promise Owens that he could "be with [Baldwin]."  Owens said he took that to mean "to have sex with her" and "thought [Squyres] was just playing or something."  The trial judge resolved the conflicts in the testimony and found Squyres to be more believable.  See Gray v. Commonwealth, 233 Va. 313, 344, 356 S.E.2d 157, 174, cert. denied, 484 U.S. 873 (1987).  That credibility determination finds support in the record.  Thus, we cannot say that the record supports a finding that Owens' statement was induced by a promise of sexual favors.

The record does reflect that Squyres provided Owens the opportunity to engage in sexual relations with Baldwin after the statement was signed.  Squyres testified that he knowingly left Owens, who was in custody, alone and unobserved in a locked room with Baldwin.  By Squyres' own testimony, Owens and Baldwin were alone for thirteen minutes.

The record establishes no reason for Baldwin and Owens to have been left unattended in this manner.  Although the record supports the trial judge's finding that the sex was not an inducement, Squyres' conduct in this matter raises a serious

- 10 -

question of the propriety of his methods.  Even if, as Squyres testified, he was not aware that Owens and Baldwin had sexual intercourse, he certainly was aware that he afforded Owens and Baldwin the opportunity to engage in sexual intercourse or any other activity available to them in the privacy of the locked interrogation room.

Although the evidence proved Squyres acted with impropriety, Owens has failed, however, to show that the favor Squyres bestowed upon him after he had given a statement induced him to make the statement.  Accordingly, the proof fails to establish that his statement was involuntary.

IV.

Owens contends that his Sixth Amendment right to counsel was violated when he was denied his request to see his attorney on the morning of February 19.  Owens' motion to suppress, however, raised only the issue of a Fifth Amendment violation.  Owens' counsel never asserted a Sixth Amendment claim in the court below and is barred from raising this issue now for the first time on appeal.  Rule 5A:18.

For these reasons, we affirm Owens' convictions.

<u>Affirmed</u>.