PRESENT: All the Justices

CHARLIE JEFFREYS

v. Record No. 171467

OPINION BY
JUSTICE D. ARTHUR KELSEY
FEBRUARY 14, 2019

THE UNINSURED EMPLOYER'S FUND, ET AL.

FROM THE COURT OF APPEALS OF VIRGINIA

Charlie Jeffreys was injured while renovating a historic school building. The Virginia Workers' Compensation Commission denied his claim for benefits against a church and a historical society, which Jeffreys had alleged were his statutory employers. The Court of Appeals affirmed. On appeal to us, Jeffreys argues that the Court of Appeals erred in affirming the Commission's decision not to award him benefits. We disagree.

I.

A.

By statute, determinations of the Commission "shall be conclusive and binding as to all questions of fact." Code § 65.2-706(A). Consequently, on appeal, "we do not retry the facts before the Commission nor do we review the weight, preponderance of the evidence, or the credibility of witnesses." *Caskey v. Dan River Mills, Inc.*, 225 Va. 405, 411 (1983). "If there is evidence or reasonable inference that can be drawn from the evidence to support the Commission's findings, they will not be disturbed by this Court on appeal, even though there is evidence in the record to support contrary findings of fact." *Id.* This deference to the Commission's factfinding necessarily requires that we, as well as the Court of Appeals, construe the evidence in the light most favorable to the prevailing parties before the Commission. *See Rodriguez v. Leesburg Bus. Park, LLC*, 287 Va. 187, 193 (2014); *R & T Invs., Ltd. v. Johns*, 228 Va. 249, 253-54 (1984).

B.

The Harvey Colored School ("the School") is a small building where African-American students in Pittsylvania County were educated from approximately the 1880s to the mid-1900s. About 15 former students and interested individuals, led by Annie Mosby, formed the Harvey School Historical Society ("the Historical Society")[1] "to restore the school to its original condition" and to register it as a historical site. 2 J.A. at 804. The Historical Society operated as a non-profit organization. Its mission was "to purchase, restore, preserve, and maintain the Harvey Colored School as a historical site." *Id.* at 801-02. Mosby lived in California and directed the Historical Society's activities from there.

Seeking tax-exempt status, the Historical Society became an "auxiliary" of the Mount Lebanon Missionary Baptist Church (the "Church") in 2003. *Id.* at 800, 811-12, 817-18. The record is unclear regarding the precise nature of this informal relationship. Practically speaking, however, the relationship appears merely to have allowed the Historical Society to meet in the Church building. The Church provided no financial support to the Historical Society, and the two entities maintained separate bank accounts. The Church neither participated in the decisions that the Historical Society made nor exercised any control over the Historical Society.

In 2012, Mosby entered into an agreement with William Johnson, an unlicensed contractor, to relocate and renovate the school. Having no construction experience, Mosby relied entirely on Johnson to plan and perform the renovation. While she was briefly present on site at the beginning of the project, Mosby lived in California and did not exercise any control over Johnson or over any aspect of his working conditions. Johnson initially worked with one other

---

[1] The Historical Society sometimes refers to itself as the Harvey School Restoration Society. *See, e.g.*, 2 J.A. at 804.

2

individual on the job, but he later asked Mosby for permission to hire Jeffreys as well. Mosby agreed. Johnson was the "boss" on the job, *id.* at 522, 700, and exclusively managed Jeffreys on the worksite. Johnson kept records of Jeffreys's work hours and reported them to Mosby for payment. Mosby never met Jeffreys and did not know his name prior to his injury.

While working for Johnson, Jeffreys was badly injured when a beam fell from the roof of the school building and struck him on the neck. He filed a claim for workers' compensation benefits against Mosby, the Church, and the Historical Society — but not against Johnson. Because none of the defendants had workers' compensation insurance, the Uninsured Employer's Fund ("UEF") was also made a party. Jeffreys argued that Mosby, the Church, and the Historical Society were his direct employers and thus owed him compensation. In the alternative, Jeffreys contended, each defendant was his statutory employer pursuant to Code § 65.2-302 because he had been performing work within their trade, business, or occupation.

A deputy commissioner agreed that Jeffreys was the direct employee of the Historical Society as well as Mosby, who was acting as the Historical Society's "agent," and that the Historical Society was in turn "a part of the Church, making the Church an employer of" Jeffreys as well. 2 J.A. at 879-81. The deputy commissioner entered an award against the Church. The full Commission disagreed in part, holding that Mosby was not Jeffreys's direct employer because she had lacked any meaningful control over his work or over how he performed it. However, the Commission affirmed the deputy commissioner's award against the Church because no party had appealed that decision.

The Court of Appeals affirmed the Commission's finding that Mosby was not Jeffreys's direct employer, reversed the Commission's finding that the UEF had waived its argument regarding the Church and the Historical Society, and remanded the case for further factfinding.

3

*See Uninsured Emp'r's Fund v. Jeffreys*, Record No. 1676-15-3, 2016 WL 1637823, at *6 (Va. Ct. App. Apr. 26, 2016) (unpublished). On remand, the Commission held that "there was insufficient evidence to conclude the Historical Society and the Church were the claimant's employer." 2 J.A. at 1034. Neither had exercised any control over Jeffreys. Instead, Johnson had "recruited" Jeffreys, had told Jeffreys "what to do each day, [had] kept track of his hours and [had been] the 'boss' on the project." *Id.* at 1035. Moreover, the Commission added, "Johnson was not an employee of Mosby either." *Id.* Johnson "was free to adopt the methods he needed to accomplish the result" and to decide "what materials were needed." *Id.* Johnson was, at most, "an independent contractor," *id.* at 1036, and thus, Jeffreys, who worked under Johnson, could not have been a direct employee of any of the individual defendants.

Having held that none of the three individual defendants were Jeffreys's direct employer, the Commission turned to the statutory-employer argument. "There is no evidence the Church and Historical Society were in the construction business," the Commission stated, "[h]ence there is no statutory employer situation at issue here." *Id.* Jeffreys appealed again to the Court of Appeals, which affirmed the Commission's decision.

## II.

On appeal to us, Jeffreys contends that the Court of Appeals and the Commission erroneously held that the Church and the Historical Society were not his statutory employers. We disagree.

### A.

The Workers' Compensation Act requires an employment relationship of some kind to exist between a claimant and the party allegedly liable for compensation. The usual scenario is a true employer-employee relationship in which the employer controls the employee's jobsite

4

conditions, employment tasks, and working hours. In 1991, however, the General Assembly

enacted Code § 65.2-302, which created a new category of employment relationship called

"Statutory employer." In relevant part, that section provides:

> A. When any person (referred to in this section as "owner")
> undertakes to perform or execute any work which is a part of
> his trade, business or occupation and contracts with any other
> person (referred to in this section as "subcontractor") for the
> execution or performance by or under such subcontractor of the
> whole or any part of the work undertaken by such owner, the
> owner shall be liable to pay to any worker employed in the
> work any compensation under this title which he would have
> been liable to pay if the worker had been immediately
> employed by him.
>
> B. When any person (referred to in this section as "contractor")
> contracts to perform or execute any work for another person
> which work or undertaking is not a part of the trade, business
> or occupation of such other person and contracts with any other
> person (referred to in this section as "subcontractor") for the
> execution or performance by or under the subcontractor of the
> whole or any part of the work undertaken by such contractor,
> then the contractor shall be liable to pay to any worker
> employed in the work any compensation under this title which
> he would have been liable to pay if that worker had been
> immediately employed by him.
>
> C. When the subcontractor in turn contracts with still another
> person (also referred to as "subcontractor") for the performance
> or execution by or under such last subcontractor of the whole
> or any part of the work undertaken by the first subcontractor,
> then the liability of the owner or contractor shall be the same as
> the liability imposed by subsections A and B of this section.

Code § 65.2-302(A)-(C). *See generally* Lawrence J. Pascal, Virginia Workers' Compensation

Law and Practice, § 2.08[3][a]-[b], at 2-35 to -39 (4th ed. 2011).[2]

---

[2] The Act similarly protects loaned or borrowed employees. *See, e.g.*, *Metro Mach. Corp. v. Mizenko*, 244 Va. 78, 82 (1992) (describing the application of the borrowed-servant doctrine under both federal and Virginia workers' compensation statutes); *Ideal Steam Laundry v. Williams*, 153 Va. 176, 179-82 (1929) (concluding that although the Act "is silent with reference to the status of a loaned employee," the common law governing masters and servants

5

Subsection A addresses the scenario in which "any person" contracts with an independent contractor to perform work within the "trade, business or occupation" of that "any person." Code § 65.2-302(A). This situation often occurs when a business outsources its own unique "trade, business or occupation," *id.*, to an independent contractor, for example, when a roofing company hires an independent contractor to repair a roof. In these situations, we have applied what has become known as the normal-work test, which asks whether the activity in which the independent contractor engages is "*normally* carried on through employees rather than independent contractors." *Shell Oil Co. v. Leftwich*, 212 Va. 715, 722 (1972) (emphasis in original) (citation omitted). In this way, subsection A involves a two-tiered scenario: Party X contracts with Party Y to do work within Party X's trade, business, or occupation. When this takes place, Party X becomes the statutory employer of Party Y's employees.

Subsection B involves a three-tiered scenario: A "person" hires a contractor to perform work *outside* the scope of *that* person's "trade, business or occupation." Code § 65.2-302(B). The contractor then hires a subcontractor to do some or all of that work. In this scenario, we have applied what has become known as the subcontracted-fraction test. *See Cooke v. Skyline Swannanoa, Inc.*, 226 Va. 154, 158-59 (1983). An example of this scenario would be where a banker — whose business is banking rather than construction — enters into a contract with a general contractor to build a home, and the general contractor in turn relies on subcontractors (e.g., firms employing framers, brick masons, electricians, etc.) to complete the job.[3] The general contractor, not the banker, becomes the statutory employer of the subcontractors'

---

applies to determine whether an individual was acting as an employee of another). *See generally* 5 Arthur Larson et al., Larson's Workers' Compensation Law § 67.01, at 67-2 to -3 (2018); Pascal, *supra*, § 2.08[2], at 2-34 to -35 (4th ed. 2011 & Supp. 2018).

[3] Subsection C extends the reach of subsections A and B to cover situations where the first covered subcontractor hires his own subcontractors.

employees. *See, e.g.*, *Cinnamon v. International Bus. Machs. Corp.*, 238 Va. 471, 474-79 (1989).[4]

The Act makes clear, however, that these scenarios are exceptions to the general rule that "nothing in [the Act] shall be construed to make the employees of any independent contractor the employees of the person or corporation employing or contracting with such independent contractor." Code § 65.2-101. Consequently, "the mere fact a business owner engages an independent contractor does not make that independent contractor's employees statutory employees of the owner." *Rodriguez*, 287 Va. at 194 (quoting *Henderson v. Central Tel. Co. of Va.*, 233 Va. 377, 381 (1987)).[5]

B.

Before focusing on the specific provisions governing this case, we must address Jeffreys's overarching assertion that the Workers' Compensation Act should receive "a liberal

---

[4] Depending upon the circumstances, subsections A and B can overlap each other. But they do not necessarily do so. When subsection B applies, the contractor becomes the statutory employer of the subcontractor's employee, and "[t]his is true even if that work is not normally a part of the []contractor's normal work, but is a subcontracted fraction of the main contract." 15 Virginia Practice Series, Workers' Compensation § 4:12, at 24 (2018 ed.).

[5] The general rule and its exceptions harmoniously serve the statute's

> purpose to bring within the operation of the Compensation Act all persons engaged in any work that is a part of the trade, business or occupation of the original party who undertakes as owner, or contracts as contractor, to perform that work, and to make liable to every employee engaged in that work every such owner, or contractor, and subcontractor, above such employee. But when the employee reaches an employer in the ascending scale, of whose trade, business or occupation the work being performed by the employee is not a part, then that employer is not liable to that employee for compensation. At that point [Code § 65.2-101] intervenes and the employee's right of action at common law is preserved.

*Cinnamon*, 238 Va. at 475 n.1 (alterations and citation omitted).

7

construction and application of the law in favor of the worker" in order to "accomplish the purpose of the Legislature in enacting our Workers' Compensation statute," Appellant's Br. at 7, 28-29. We frequently apply this simple principle[6] but guard against doing so simplistically.[7]

Our caution stems from the unique nature of the Workers' Compensation Act. The Act reflects a legislative "quid pro quo" that gave workers the right to assert no-fault liability against their employers (a right that they had never possessed) and took from them the right to sue their employers in tort for negligence (a right that they had possessed under the common law).[8] The liberal-construction principle, if misapplied, could upset this delicate balance. A view of the Act's coverage that is too broad would authorize an award of compensation benefits but would bar a tort recovery, and a view that is too narrow would authorize a tort recovery but would bar an award of compensation benefits.

Jeffreys contends that he lost his claim for compensation benefits because the Court of Appeals and the Commission had failed to interpret Code § 65.2-302 liberally in his favor. This result is illiberal, however, only because Jeffreys has no viable negligence claim against the

---

[6] In certain contexts, this liberal-construction principle has played a measurable role in our construction of the Act. *See, e.g.*, *American Original Foods, Inc. v. Ford*, 221 Va. 557, 561-62 (1980); *Dowdy v. Giant of Va., Inc.*, 210 Va. 408, 410 (1969); *Byrd v. Stonega Coke & Coal Co.*, 182 Va. 212, 221-22 (1944); *Scott Cty. Sch. Bd. v. Carter*, 156 Va. 815, 824 (1931); *Farmers Mfg. Co. v. Warfel*, 144 Va. 98, 104-05 (1926); *Gobble v. Clinch Valley Lumber Co.*, 141 Va. 303, 305-06 (1925).

[7] In other contexts, this principle has played no role at all. *See, e.g.*, *Redifer v. Chester*, 283 Va. 121, 126-27 (2012); *Snead v. Harbaugh*, 241 Va. 524, 527-29 (1991); *American Furniture Co. v. Doane*, 230 Va. 39, 42 (1985); *Rust Eng'g Co. v. Ramsey*, 194 Va. 975, 980 (1953); *Kent v. Virginia-Carolina Chem. Co.*, 143 Va. 62, 65-67 (1925); *Board of Supervisors v. Lucas*, 142 Va. 84, 94-95 (1925); *Mann v. City of Lynchburg*, 129 Va. 453, 459-60 (1921) (per curiam).

[8] *See Gibbs v. Newport News Shipbuilding & Drydock Co.*, 284 Va. 677, 682 (2012); *Roller v. Basic Constr. Co.*, 238 Va. 321, 327 (1989); *Whalen v. Dean Steel Erection Co.*, 229 Va. 164, 170-71, *appeal dismissed*, 474 U.S. 802 (1985).

8

Church or the Historical Society. If he had such a claim and had asserted it, the Church and the Historical Society — not Jeffreys — would be insisting that Code § 65.2-302 be construed broadly. *See* Code § 65.2-307(A); Pascal, *supra*, § 2.08[3][a], at 2-36 (4th ed. 2011). A precedent-setting construction of the Act cannot depend on whether the injured worker is before the Commission seeking an expansive application of the Act's coverage or before a circuit court seeking a restrictive application.[9] A uniform principle of law, by its nature, cannot fluctuate based upon the forum in which it is advocated or the identity of its advocates.

Rightly applied, the liberal-construction principle means only that an interpretation of the Workers' Compensation Act should take into account the humane, beneficent purposes embedded in the legislative quid pro quo. That interpretative preset does not "permit a liberal construction to change the meaning of the statutory language or the purpose of the Act," *American Furniture Co. v. Doane*, 230 Va. 39, 42 (1985), or "authorize the amendment, alteration, or extension of its provisions," *Van Geuder v. Commonwealth*, 192 Va. 548, 553 (1951) (citation omitted). Nor does the principle "go to the extent of requiring that every claim asserted should be allowed," *id.* (citation omitted),[10] or permit the Act to be "converted into a form of health insurance," *Doane*, 230 Va. at 42.[11] Instead, the Act should be liberally

---

[9] The line between coverage and non-coverage under the Act is a matter of great significance. A claimant seeking benefits under the Act, unlike a plaintiff in a tort suit, cannot recover damages for pain and suffering or for loss of future earning capacity. *See Clinchfield Carbocoal Corp. v. Kiser*, 139 Va. 451, 454 (1924); 9 Larson et al., *supra* note 2, § 100.05[1][d], at 100-41 to -42; Pascal, *supra*, § 1.03, at 1-5. And compensation benefits, unlike damages awarded by juries in tort cases, are calculated based upon statutory schedules that leave the decisionmaker, usually a deputy commissioner, with little or no discretion. *See, e.g.*, Code §§ 65.2-500(A), -502(A), -503, -512(A), -518.

[10] *See also Conner v. Bragg*, 203 Va. 204, 207-08 (1962); *Humphries v. Newport News Shipbuilding & Dry Dock Co.*, 183 Va. 466, 479 (1945).

[11] *See also Morris v. Morris*, 238 Va. 578, 584 (1989); *Lane Co. v. Saunders*, 229 Va. 196, 199 (1985); *Virginia Elec. & Power Co. v. Cogbill*, 223 Va. 354, 357 (1982); *Vega*

interpreted consistent with its text and its underlying quid-pro-quo purpose to benefit all workers.

C.

1.

The contest in this case involves the application of subsection A of Code § 65.2-302. We have applied that provision and its predecessors in various contexts, including those involving both private-business employers[12] and governmental employers.[13] Applying subsection A "is not a simple, straightforward exercise." *Rodriguez*, 287 Va. at 193 (citation omitted). Nor is it made easier by the bifurcated nature of appellate review in which we review the legal principles de novo but show great deference to the Commission's direct and inferential factfinding.

The starting point in the analysis is "identifying 'the nature of the particular owner'" or contractor, which often requires us to distinguish between a "governmental entity or public utility" on the one hand and "a private entity" on the other. *Id.* at 195 (quoting *Nichols v. VVKR, Inc.*, 241 Va. 516, 521 (1991)). A private entity, unlike a governmental entity or a public utility, has broad discretion to choose its activities and, thus, to define its own unique nature. *See Henderson*, 233 Va. at 383. "Whereas a private business entity is essentially self-defining in terms of its trade, business, or occupation, a public utility has duties, obligations, and responsibilities imposed upon it by statute, regulation, or other means." *Id.*

---

*Precision Labs., Inc. v. Jwayyed*, 218 Va. 1026, 1032 (1978); *J.A. Jones Constr. Co. v. Martin*, 198 Va. 370, 377-78 (1956); *Rust Eng'g Co.*, 194 Va. at 980; *Van Geuder*, 192 Va. at 552.

[12] *See, e.g.*, *Rodriguez*, 287 Va. at 194-98; *Johnson v. Jefferson Nat'l Bank*, 244 Va. 482, 485 & n.1 (1992); *Nichols v. VVKR, Inc.*, 241 Va. 516, 521-23 (1991); *Cinnamon*, 238 Va. at 474, 478; *Carmody v. F.W. Woolworth Co.*, 234 Va. 198, 203 (1987); *Shell Oil Co.*, 212 Va. at 719, 724.

[13] *See, e.g.*, *Jones v. Commonwealth*, 267 Va. 218, 221-25 (2004); *Roberts v. City of Alexandria*, 246 Va. 17, 19-20 (1993); *Ford v. City of Richmond*, 239 Va. 664, 669 (1990); *Henderson*, 233 Va. at 383; *Williams v. E.T. Gresham Co.*, 201 Va. 457, 458, 460-61, 464-65 (1959); *Anderson v. Thorington Constr. Co.*, 201 Va. 266, 272-74 (1959), *appeal dismissed per curiam*, 363 U.S. 719 (1960).

10

When addressing private entities, we generally apply the normal-work test to subsection A of Code § 65.2-302. This test asks *not*

> whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test . . . is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors.

*Shell Oil Co.*, 212 Va. at 722 (emphasis in original) (citation omitted). This test serves as a "corollary guide, sometimes useful but not indispensable, in applying the literal language of the statutes to the facts in a particular case." *Rodriguez*, 287 Va. at 196 (citation omitted).

One recurring problem in applying this statute is how to treat a company with no employees. We have stated that a construction company whose trade, business, or occupation is obviously construction cannot disclaim statutory-employer status simply by hiring no employees and subcontracting all of its construction projects to others. *See id.* at 194; *Henderson*, 233 Va. at 381. But we have also explained that merely because a private entity has no employees and relies solely on independent contractors does not mean that everything that the contractors do constitutes the trade, business, or occupation of the entity, even though it oversees the contractors to ensure that the work is "done properly." *See Rodriguez*, 287 Va. at 197-98.

In *Rodriguez*, a developer was engaged in the business of developing an industrial warehouse park. Having no employees of its own, the developer hired a contractor to construct the warehouses. We observed that "[t]he development of the property, including the construction of the warehouses, was obviously essential" to the developer's business plan. *Id.* at 197. That fact, however, did not necessarily mean that warehouse *construction* was part of the developer's trade, business, or occupation. "While many activities may be important or even

11

'indispensable' to the success of a business, those activities do not necessarily constitute the trade, business, or occupation of the owner." *Id.* (citation omitted).

Put another way, "[t]he test is not whether the owner, by engaging an independent contractor to perform some part of his business, thereby engages in the business of the independent contractor. It is whether the independent contractor is performing work that is part of the trade, business or occupation of the owner." *Floyd v. Mitchell*, 203 Va. 269, 274 (1962). For example, "[e]very manufacturer must have a plant, but this fact alone does not make the work of constructing a plant a part of the trade or business of every manufacturer who engages a contractor to construct a plant," *Stone v. Door-Man Mfg. Co.*, 260 Va. 406, 413 (2000) (citation omitted); *Cinnamon*, 238 Va. at 478 (citation omitted), and while selling gasoline is "indispensable" to the "business" of every major oil company, that fact alone does not mean that the oil company is itself in the business of selling gasoline, *see Shell Oil Co.*, 212 Va. at 722-24.

2.

In this case, Jeffreys had the burden of proving his statutory-employer claim for workers' compensation benefits from the Church and the Historical Society. *See Byrd v. Stonega Coke & Coal Co.*, 182 Va. 212, 219 (1944) ("[T]he claimant must carry the burden of proving his claim."). Acting in its factfinding capacity, the Commission reviewed the history of the Historical Society, its informal governance structure, its charitable and nonprofit purposes, its fundraising and community-outreach efforts, its lack of any experience or involvement in the business of construction or renovation, and Mosby's role in its activities. Jeffreys failed to persuade the Commission that his reconstruction work on the school building was part of the trade, business, or occupation of the Church or the Historical Society. Discerning no misunderstanding of law on the Commission's part, the Court of Appeals held that a rational

12

factfinder could find Jeffreys's allegations factually unpersuasive. We agree.

The Court of Appeals began its analysis by "identifying 'the nature of the particular owner'" or contractor. *Rodriguez*, 287 Va. at 195 (citation omitted). Viewing the factual record through the prism of an appeal — which required it to consider the facts in the light most favorable to the Church and the Historical Society as the prevailing parties before the Commission — the Court of Appeals followed the evidence in detail to its inevitable, rational conclusion:

> When we review the characteristics of the Historical Society and the activities normally carried out by its members, we conclude that the complete reconstruction of the Harvey School was not a part of the Historical Society's "trade, business, or occupation." While the ultimate goal of the Historical Society was to "restore" the school, the rebuilding project at issue was simply beyond its capabilities.
>
> The Historical Society was not a construction company or a commercial property developer. It was a small, grassroots, nonprofit organization with limited resources. It had approximately fifteen members at the height of its success. None of the evidence presented in this case established, or even implied, that the members of the Historical Society could undertake the construction project at issue.
>
> Similarly, the evidence failed to establish that the members of the Historical Society engaged in construction-related activities on a regular basis. Rather, the members of the Historical Society engaged in fund-raising activities and activities designed to encourage community support for their project. Correspondence between Mosby and members of the Historical Society established that the Historical Society intended to hire contractors to dismantle, move, and rebuild the school, and the evidence presented in this case did not imply that members of the Historical Society intended to participate in this project.
>
> We acknowledge that the restoration of the Harvey School necessarily involved certain construction-related activities. The complete reconstruction of the school building, however, fell outside of any routine restoration work. While the Historical Society was formed to "restore" the school, its "trade, business, or occupation" did not include the complete reconstruction of the building.
>
> For these reasons, we conclude that the reconstruction of the Harvey School was not the Historical Society's "trade, business, or

13

occupation." The complete reconstruction of the school was beyond the restoration project envisioned by the Historical Society, and its members were not involved in the reconstruction project or other construction activities. Accordingly, we conclude that the Commission correctly determined that the Historical Society and the Church were not engaged in the construction business, and we affirm its decision that neither of those parties was Jeffreys's statutory employer.

*Jeffreys v. Uninsured Emp'r's Fund*, Record Nos. 0660-17-3, 0693-17-3, 2017 WL 4363874, at

*7-8 (Va. Ct. App. Oct. 3, 2017) (unpublished) (citations omitted).[14]

When the legal principles properly frame the question, "[d]etermining whether work is part of the trade, business, or occupation of an owner 'depends upon the facts and circumstances of the particular case,'" *Rodriguez*, 287 Va. at 198 (citation omitted). As the Court of Appeals correctly held, the Commission applied the correct legal standard and acted within its factfinding discretion when it concluded that Jeffreys had failed to prove that the Church or its Historical Society were his statutory employers.[15]

---

[14] In reaching this conclusion, the Court of Appeals correctly distinguished *Pfeifer v. Krauss Construction Co. of Virginia*, 262 Va. 262 (2001). In that case, a developer "had been formed *solely* to build and develop" condominiums on property that the developer owned. *Id.* at 268 (emphasis added). For purposes of Code § 65.2-302, there was no dispute that the developer's trade, business, or occupation included building the condominiums and developing the surrounding property. Here, the parties disputed the trade-business-occupation issue agreed upon in *Pfeifer*, and the Commission made a factual finding that the Church and the Historical Society were not engaged in the construction business. *See, e.g.*, *Cinnamon*, 238 Va. at 479 (finding that an owner/manufacturer's "trade, business, or occupation" did not include "construction work" on the plant that it had "engaged an independent contractor to perform").

[15] Jeffreys claims that the Court of Appeals made erroneous factual findings and thereby violated his due process right to an appeal. *See* Appellant's Br. at 21-25, 37-42; Reply Br. at 14. We disagree. The lengthy quotation above from the opinion of the Court of Appeals demonstrates that it did not engage in its own factfinding but instead relied solely on the facts established before the Commission. We find no due process violation.

Jeffreys also takes issue with several statements of the Court of Appeals and the Commission to the effect that the Church and the Historical Society were not engaged in construction. *See* Appellant's Br. at 25-27; Reply Br. at 6-7; Oral Argument Audio at 1:18 to 3:11, 30:50 to 31:25. To Jeffreys, these statements suggest that the Commission and the Court of Appeals misunderstood the proper legal standard. We find no merit in this assertion because "we

III.

We affirm the Court of Appeals, finding no error in its reasoning or in its result.

*Affirmed.*

---

will not fix upon isolated statements of the [Court of Appeals or the Commission] taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied," *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977).