COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:   Chief Judge Decker, Judges Malveaux and Friedman
Argued at Richmond, Virginia


CATHRYN ROSE RAINEY

OPINION BY
v.        Record No. 0572-21-2         JUDGE FRANK K. FRIEDMAN
MARCH 8, 2022

CHAD CHRISTOPHER RAINEY


FROM THE CIRCUIT COURT OF HANOVER COUNTY
Theodore J. Markow, Judge Designate

Taylor B. Stone (Janus & Stone, P.C., on brief), for appellant.

Alexandra D. Bowen (Jamie L. Allgood; Linda R. Scott, Guardian
*ad litem* for the minor children; Bowen Ten, PC; Linda R. Scott,
PLC, on brief), for appellee.


Cathryn Rose Rainey ("mother") appeals from the trial court's decision in a custody and

visitation dispute between mother and Chad Christopher Rainey ("father").  The parties have two

minor children ("daughter" and "son").

Mother asserts a series of errors in the trial court's handling of the custody and visitation

proceedings below.  She argues that the trial court misconstrued its *de novo* fact-finding and

decision-making obligations and, instead, acted as an appellate tribunal in simply "affirming" the

juvenile and domestic relations district court's rulings.  She further contends that the trial court

failed to identify the basis of its ruling orally or in writing as required under Code § 20-124.3.

Mother also claims that the trial court erred by abdicating its authority to decide visitation and by

granting father, in consultation with counselors, the power to decide when and whether to expand

her visitation.  Finally, mother challenges the trial court's decision to award sole legal and physical

custody of the children to father.

We affirm in part, reverse in part, and remand the visitation determination to the trial court.

FACTUAL BACKGROUND[1]

A. The Family Unit is Roughly Upended

Father and mother were married for sixteen years. For most of the marriage, mother was the primary caregiver to daughter and son, as father traveled for work around 130 to 140 days a year. By all accounts, mother was a loving and attentive parent who had good relationships with both children. Mother and father lived with the children in mother's parents' house from the time son was an infant and daughter was born. The children were very close with their grandmother ("grandmother"), who was a major part of their upbringing and helped raise the children; she helped mother take care of them while father was traveling for work and helped father with the children if mother was not home.

In 2016, when son was eight years old and daughter was four years old, father announced that he was having an affair, and, according to trial testimony, did a very poor job of communicating this information—and his imminent departure from the family home—to his wife and children. He testified that the manner in which he delivered this news to his son was "probably one of the stupidest things I have ever done." A contentious divorce ensued. Tensions between mother and father were high. For example, in 2017, there was an incident in which father assaulted mother and wrestled a phone from her in front of the children. Father also acted aggressively toward mother and grandmother with the children present on several other occasions. After the parties' separation, the children exhibited anxiety and fear about visiting father.

---

[1] We view the evidence, and reasonable inferences fairly deducible therefrom, in the light most favorable to father, the prevailing party before the trial court. *See, e.g.*, *Anderson v. Anderson*, 29 Va. App. 673, 678 (1999).

### B. The Post-Separation Relationship Between Father and Children

The trial court entered a final consent custody and visitation order on December 22, 2017. This order granted the parties joint legal custody but gave mother primary physical custody and father visitation. The order directed the parties to continue to follow instructions from the clinical visitation supervisor and to gradually increase father's visitation. The trial court remanded further custody and visitation issues to the juvenile and domestic relations district court ("JDR court").

Visitation with father did not go well during this time frame. Testimony established that the children were reluctant to visit father, particularly overnight, and treated him disrespectfully. Father also acknowledged, in retrospect, he may have tried to introduce his new girlfriend (now wife) to the children too quickly. The reunification process with the children and father was encouraged through therapy and counseling; this required multiple, weekly therapy sessions between the children and their therapist, and separate sessions between the children and a reunification counselor. Mother was left primarily responsible for arranging these visits within her schedule and the children's, as well as tasked with transporting them to the appointments. For example, it fell on mother to take the children to these sessions thirty-seven times in 2017. Father complained that the children remained reluctant to visit with him and were particularly unhappy during overnight visits with him; he blamed this on mother's behavior. A.J. Johnson was the professional "boots on the ground" counselor helping the parties parent in live time. He testified that he did not see mother doing anything to obstruct father's relationship with the children and she "had no problem with [father] seeing [them]." In early 2019 father, himself, cut off visitation with an explanation that it was not good for him or the kids to continue without first repairing their relationship.

C. <u>Mother Consents to Letting Father Assume Temporary Physical Custody</u>

Father then filed motions with the JDR court to either transfer physical custody to him or increase his visitation. He alleged that mother had failed to facilitate visitation and had not supported the relationship between father and the children. In response, mother agreed to let father have full custody *temporarily* as a bridge to fostering reunification.

In light of the parties' agreement, the JDR court entered a temporary consent order on July 3, 2019, transferring physical custody to father. The order explains that the parties reached this agreement after speaking with Dan Kniffen ("Kniffen") (children's therapist) and Wendy Haupt ("Haupt") (reunification counselor). The judge had a meeting *in camera* with the children. The temporary order gave mother contact time only as the parties agreed after consultation with Kniffen and Haupt. The order itself *did not* restrict mother's communication with the children other than this proviso—in other words, it did not limit mother to communicating with her children through letters at this point. (This restriction was added later.) Both parents were instructed to continue their individual therapy, co-parenting counseling, and appointments with Dr. Nelson, a psychologist involved with the reunification process.

Mother testified that she agreed to switch custody to father to encourage the children's relationship with father, and father did not dispute that mother agreed to the temporary custody switch for this purpose.[2] The temporary order explained it was the parties' intention to work toward shared physical custody. The testimony and evidence at trial showed that mother believed this arrangement would be temporary.

---

[2] Mother testified that her own late father had been a strong, positive influence in her life and she wanted the children to reconnect with father. She further acknowledged that the process of litigation and therapy costs of trying to reunite the children with father had worn her down financially, to the point where her funds were "basically . . . gone."

- 4 -

Instead, since consenting to this arrangement, mother has not seen her children since July 3, 2019. The children have also not seen grandmother, a daily presence in their lives, since July 2019, though father has allowed daughter to exchange occasional letters with grandmother.

D. Father and the Counselors Strictly Limit the Children's Contact with Mother

The reunification program to get father back in the children's lives was premised on immersing the children in contact with father. It is apparent that mother struggled with the relinquishment of her children, and her loss of contact with them, shortly following the July 3, 2019 transfer of custody to father. Dr. Nelson referred to this as "buyer's remorse."

Dr. Nelson prepared reports in connection with the custody and visitation proceedings; in the July 31, 2019 report Dr. Nelson explained daughter had written mother that she wanted to come home because she was unhappy, mistreated, and no one was listening to her. Following this communication, mother wrote a letter to daughter and tried to deliver it through one of the therapists involved in the case. In the offending letter—in addition to urging daughter to give father a chance—mother wrote: "I know you are scared, sad, confussed [sic] and angry right now. You are feeling like you are being punished and you are, but not for anything you did . . . . You don't deserve this." Dr. Nelson was concerned that this type of language was counter-productive to reunification and, in conjunction with mother's difficulty with therapy, Dr. Nelson concluded that mother should not have any unsupervised contact with the children. mother and daughter were also caught passing notes clandestinely—without counselor permission—through an intermediary at daughter's gymnastics class. This raised concerns for the counselors about mother's boundaries and ability to follow rules.

Dr. Nelson completed another report on September 16, 2019, in which she indicated that the children were doing well with father.[3] Dr. Nelson explained that she, and the other professionals involved, thought it was in the children's best interest to have contact with both parents, so long as both parents behaved appropriately. Dr. Nelson also explained that mother was so angry at father, unpredictable, and lacking in insight that exposing the children to her would be harmful; son could have increased depression, and daughter's anxiety could be heightened. But, Dr. Nelson said this was a "difficult" thing for her to opine because mother "[had] done so many good things as a parent . . . until [custody was switched on July 3, 2019,] and the children miss, need, and want to see her." Dr. Nelson explained that mother had been instructed to write letters to the children with the assistance of counselors in order to begin reestablishing contact but she had disengaged from participation in the therapeutic letter writing process.

E. The JDR Court Order Gives Custody to Father and Puts Visitation in Father's Control

On October 9, 2019, following a hearing, the JDR court found a material change in circumstances had occurred since December 22, 2017 and entered an order in both children's cases explaining its reasoning. It found that father made efforts to improve his relationship with his children, including therapy. Based on the September 2019 report from Dr. Nelson, which it incorporated into the order, the JDR court found that mother had undermined father's reunification with the children by sending letters with alienating language to daughter. Mother was ordered not to have any contact with the children other than through therapeutic letter writing. The JDR court order gave father discretion as to when to increase mother's visitation

_____

[3] Dr. Nelson had not met with mother in about two months, since before her previous July report, when she issued this new report.

beyond counselor-assisted letter writing and required mother to solely bear the cost of a paid supervisor if one was chosen. Father has had the authority to permit visitation since that time.

Dr. Nelson completed yet another report dated July 17, 2020. She continued to show concern over mother's disengagement with reunification letter writing and found that the children were having issues with mother's lack of communication. She opined that, if mother refused any sort of supervised or therapeutic visitation, mother should have no contact. Mother did not agree that visitation should be supervised, but her non-compliance with the prescribed counselor-assisted letter writing remained an obstacle to further contact.

### F.  Mother Appeals the JDR Court Decision to the Circuit Court

Mother appealed. A trial before the circuit court followed, during which the parties presented testimony from numerous witnesses over two days. The testimony and evidence are summarized in the light most favorable to father. Prior to going to live with father in July 2019, the children had been allowed to behave in rude and hostile ways toward him. They called him by his first name, said they hated him, and refused to see him or contact him. The children were seen by Kniffen for therapy beginning in 2017, at Dr. Nelson's recommendation. Kniffen reported that the children were anxious and in poor mental health when they began therapy. Son was depressed. Son's condition has improved, as has daughter's anxiety, since going to live with father.

After moving in with father in July 2019, the children's relationship with him improved. Kniffen saw the children frequently throughout 2019 and as needed following that. At trial, the evidence established that both children wanted to see mother; both children said they wanted their time with each parent to be split equally. At the time of trial, the children had not been permitted to see mother in sixteen months. They were both upset that they had not heard from mother since the summer of 2019 but clearly still loved, missed, and wanted time with mother.

Father's mental health was examined, and there were no issues observed. He had attended therapy to address anger issues. There were no issues presented with father in terms of keeping the children well taken care of and engaged in their normal daily lives. Son and daughter now appear to be happy and feel safe with father. Haupt testified that the reunification with father has been successfully resolved. The children were quick to embrace reunification and testimony established there were marked improvements in the children's relationship with father within one week, to the point that they had resumed calling him "dad" and were laughing and engaging with him.

The evidence presented at trial was consistent with Dr. Nelson's opinion that mother had been a loving, fit parent to the children prior to the custody and visitation issues with father. Dr. Nelson found mother to continue to have significant anger towards father. Dr. Nelson and Kniffen were concerned about the damage mother would do to the children's relationship with father if given unsupervised visits. At trial, mother continued to deny any role in the children's prior distress at visiting father.

Mother's only treating physician, expert psychiatrist Dr. Paul Spector, testified at trial. He saw mother six times, and he found no issues with mother other than Adjustment Disorder due to estrangement from her children. Dr. Spector stated that mother was fully capable of handling visitation and functioning well. He "ran her through the mill" and found no mental disease or reason for medication. He noted that the children had superb grades while in her care and that is usually a sign that home life is stable. He explained that when he saw her, she no longer had custody of her children and she was "understandably, extremely distressed, at not being able to even see her children." The other counselors and therapists involved did not speak with Dr. Spector.

Mother was cross-examined about the issue of not writing letters to the children in a therapeutic setting. She explained that she had written letters to the children, which she dropped off with her therapist with the expectation they would be reviewed and sent to the reunification counselor for further review. Haupt, the reunification counselor, explained that she never received these letters. Dr. Nelson said she spoke to mother's therapist, who confirmed receiving the letters. Dr. Nelson indicated that letters mother had tried to pass to the children were concerning because the tone was "not appropriate," and she used "alienating" language.

When asked why she had not complied with the JDR court order requiring her to write letters to the children through the counselors, mother explained that she did not have money to continue to pay out-of-pocket for appointments with the counselors and that she no longer trusted the counselors or what the outcome would be. She added that she delivered letters as simple as "I love you and I miss you" and the reunification team would not send them to the children because they were not written in a therapeutic setting—in other words, in the presence of a paid counselor. If she wrote letters they were rejected or used against her; if she did not write letters it was suggested she did not care about seeing her children.

## G. The Circuit Court's Ruling

The judge observed from the bench that this case bothered him more than most. He noted that he had questions about father's experts and suggested that the parties should find new counselors to foster mother's visitation. But the judge also expressed to mother that he could not imagine the stubbornness required to refuse to comply with the orders. He explained that he would not grant shared custody to mother at that time and announced that he would "pretty much affirm the lower court" ruling.[4]

---

[4] After issuing this affirmance comment, father's counsel asked the court to clarify whether it was affirming the JDR court, noting the concern for an "appellate review type of misstep," and the court confirmed that it had arrived at its conclusions based on its consideration

Both parties submitted written findings of fact prior to their closing arguments at trial. The trial court found on behalf of father, and asked father to draft the order after consultation with mother. The parties were unable to agree on the language of the order—father submitted a letter to the judge explaining that the parties could not come to an agreement and were not able to schedule a hearing before the judge to resolve the disagreement about the order. The trial court wrote a letter to the parties indicating that it reviewed the parties' findings of fact and proposed final orders and found father's proposed final order was consistent with its ruling and intent.

Father's proposed final order largely mirrored his previously submitted findings of fact. The trial court instructed mother to endorse father's draft order and note her objections. The final order awarded father sole legal and physical custody. The visitation instructions crafted in the JDR court were essentially reimposed. Mother's contact with the children was limited to letter writing; her therapist would provide approved letters to Kniffen, the children's therapist, and the letters would then be provided to the children who would receive them with Kniffen. Mother would be required to review letters from the children with a therapist. Father was instructed to consult with the children's therapists and expand (or rather, initiate) mother's visitation to therapeutic visits when "Mother is appropriate and will not cause harm to the children." Father was given sole discretion to decide when to progress beyond therapeutic visits to supervised visitation with a supervisor of his choosing, though mother was ordered to pay the costs for father's chosen supervisor.

Mother timely appealed to this Court.

---

of the presented evidence. It explained: "I'm saying I'll do what the lower court did or what the prior order says, physical custody with [father]."

ANALYSIS

I. Standard of Review

We review the trial court's decisions on custody and visitation for an abuse of discretion. *Wynnycky v. Kozel*, 71 Va. App. 177, 193 (2019) ("[A] trial court's determination with regard to [custody and] visitation is reversible only upon a showing that the court abused its discretion." (quoting *Bedell v. Price*, 70 Va. App. 497, 504 (2019))). "A trial court 'by definition abuses its discretion when it makes an error of law.'" *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 434 (2020) (quoting *Shooltz v. Shooltz*, 27 Va. App. 264, 271 (1998)).

The trial court's rulings come to us with a presumption of correctness. *Wynnycky*, 71 Va. App. at 192-93 (quoting *Stiles v. Stiles*, 48 Va. App. 449, 453 (2006)). The trial court is presumed to know and correctly apply the law "absent clear evidence to the contrary in the record." *Milam v. Milam*, 65 Va. App. 439, 466 (2015) (citing *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977)). To the extent we must consider the meaning and proper reading of governing statutes in reviewing the trial court's actions, this is a question of law subject to *de novo* review. *See Eley v. Commonwealth*, 70 Va. App. 158, 162 (2019) (noting that questions of statutory law are reviewed *de novo*).

The trial court's decision on factual issues is entitled to great weight and will not be disturbed unless plainly wrong or without evidence to support it. *Lanzalotti v. Lanzalotti*, 41 Va. App. 550, 554 (2003). Our use of this deferential standard of review "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Wynnycky*, 71 Va. App. at 193. If the trial court's findings are supported by evidence, the appellate court must uphold them even if it would have reached an entirely different conclusion. *Bedell*, 70 Va. App. at 504 ("[W]e may not retry the facts or substitute our view of the facts for those of the trial court.").

II. <u>The Trial Court Appropriately Conducted a Trial *De Novo* in Accordance with Statutory Requirements</u>

Mother correctly asserts that the trial court was required to hear and decide the issues of custody and visitation *de novo* and is not permitted to simply "affirm" the JDR court order rendered below. A party appealing to the circuit court has the right to a trial *de novo* on appeal from any final order or judgment of the JDR court affecting the rights or interests of any person coming within its jurisdiction. Code § 16.1-296; *see also Walker v. Dep't of Pub. Welfare*, 223 Va. 557, 563 (1982) (holding that a trial *de novo* in the circuit court "annuls the judgment of the [lower court] as completely as if there had been no previous trial . . . and . . . grants to a litigant every advantage which would have been [available to the litigant] had the case been tried originally in [the circuit] court"). Moreover, at a trial *de novo* in the circuit court, the parties are not restricted to the evidence presented before the JDR court. The circuit court must consider all relevant evidence, even if such evidence had not been considered by the JDR court. *Fairfax Cnty. Dep't of Fam. Servs. v. D.N.*, 29 Va. App. 400, 406 (1999). "Once the trial *de novo* commences in the circuit court, the district court *judgment* is annulled, *and is not thereafter available for any purpose*." *Alexander v. Flowers*, 51 Va. App. 404, 414 (2008) (quoting *Turner v. Commonwealth*, 49 Va. App. 381, 386 (2007)).

Here, mother suggests that the trial court's summary statement that it would "pretty much affirm the decision of the lower [JDR] court" demonstrates that the court did not assume an actual *de novo*, "clean slate" review. While mother does correctly quote the trial court, the contested statement is taken out of context and cannot be viewed in isolation. *See Yarborough*, 217 Va. at 978 ("[This Court] will not fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied."). First, the trial court's passing reference to "affirming" the prior decision does not override what the voluminous record makes evident. The trial court was attentive, engaged in fact-finding, and,

- 12 -

notably, suggested it would "affirm" while in the midst of an informed and thorough ruling. Second, the trial court then clarified, upon prompting by counsel, that it was not affirming the JDR court, but coming to a decision on its own after two days of evidence in trial.

The trial court in this case allowed mother the opportunity to present evidence and put on witnesses. It also heard evidence from six different professionals over the course of two days. It heard evidence that had not been presented to the JDR court, and which involved new matters occurring after the JDR court issued its order, including a new report from Dr. Nelson. Mother's evidence was not restricted in any way. The record in this case clearly shows that the trial court properly conducted a trial *de novo* in accordance with statutory requirements. It then entered a fourteen-page order with detailed factual findings and legal conclusions which further confirms that the trial court fully understood and adhered to the *de novo* posture of the proceedings.

III. The Trial Court Satisfied the Requirements of Code § 20-124.3 in Stating the Reasons for its Decision

In child custody cases, Code § 20-124.2 provides that "the court shall give primary consideration to the best interests of the child." In turn, Code § 20-124.3 lists ten factors that the court "shall consider" in determining a child's best interests. Code § 20-124.3 states that "[t]he judge shall communicate to the parties the basis of the decision either orally or in writing. Except in cases of consent orders for custody and visitation, this communication shall set forth the judge's findings regarding the relevant factors set forth in this section."

This Court has previously explained that Code § 20-124.3 "requires the trial court to identify the fundamental, predominating reason or reasons underlying its decision" and, further, that "the trial court must provide a case-specific explanation . . . of the fundamental, predominating reason or reasons for the decision." *Kane v. Szymczak*, 41 Va. App. 365, 372-73 (2003). This obligation cannot be met with a general statement, such as one indicating that the court "considered all the factors," but must identify the reasons why the statutory factors of Code § 20-124.3 support its

- 13 -

decision. *Id*. at 373. This level of specificity does not require the decision to address all aspects of the decision-making process, as one would expect from comprehensive findings of fact and conclusions of law. *Id*. So "long as evidence in the record supports" the circuit court's determination and it "has not abused its discretion, its ruling must be affirmed on appeal." *Wynnycky*, 71 Va. App. at 201.

The resulting final order here, endorsed by the trial court, was fourteen pages long and quite thoroughly addressed the factors set out in Code § 20-124.3. Mother's position that the trial court failed to comply with the governing statute is grounded in its instructions to endorse father's draft order, which reflected father's proposed findings of fact, along with her objections to it. The actions taken by the trial court in this regard are not prohibited by law and occur with some frequency.

Mother relies upon two cases to support her contention that the trial court failed to state the basis of its decision orally or in writing. *See Lanzalotti*, 41 Va. App. at 555-56 (finding that the trial court's order provided no reasoning for awarding custody to the mother and instructing the trial court to provide an explanation in compliance with the statute); *see also Kane*, 41 Va. App. at 373-74 (finding that the trial judge's letter opinion failed to satisfy Code § 20-124.3 because the only comment suggesting a material change of circumstances was that the father had "seen the light" in recent years). Unlike the sparse orders in both *Kane* and *Lanzalotti*, the fourteen-page final order in this case identifies each factor enumerated under Code § 20-124.3 and states specific findings under each factor. The thorough written order entered and endorsed by the trial court clearly satisfies the requirements of Code § 20-124.3.

Similarly, there was no reversible error in the trial court's selection of the draft findings of fact presented by father's counsel and incorporating them into its final order. *See United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 656 (1964) (holding that the verbatim adoption of findings suggested by a party is not automatically objectionable, so long as those findings are

- 14 -

supported by the record).  Here, the trial court stated by letter to the parties that it had reviewed

each of their proposed findings of fact and found that father's proposed findings reflected the

trial court's "ruling and intent."  Moreover, the findings clearly are supported by credible

evidence found in the record.

Finally, there is no error in the trial court's instruction to mother to endorse the order

drafted by father (while including her objections).  Rule 1:13 of the Supreme Court of Virginia

requires that "[d]rafts of orders and decrees must be endorsed by counsel of record."  Mother

was told to note her objections for the record, which she did, and she has alleged no issue with

her ability to appeal based on her endorsement.

There was no abuse of discretion by the trial court in the manner it announced its ruling.

The stated basis for the trial court's decision fully complied with the rigors of Code § 20-124.3,

particularly given its detailed order.[5]  *See Walton v. Commonwealth*, 256 Va. 85, 94 (1998) ("[A]

trial court speaks only through its orders.").

---

[5] Though the trial court's order confirms it considered the required statutory guidelines
here, mother's argument, and frustration, is not unreasonable.  For example, the trial court stated
on the record that it had "questions" about some of father's experts and advised the parties to
find new counselors going forward.  Findings of fact that are drafted by a litigant are often
partisan.  Here, father's proposed findings certainly eliminate any doubts regarding the
counselors' handling of the reunification process.  The practice of wholesale adoption of one
party's findings of fact is generally not encouraged.  *Unt v. Aerospace Corp.*, 765 F.2d 1440,
1445-46 (9th Cir. 1985).  However, the practice is permissible—as long as the findings are
supported by the record.  *See Anderson v. City of Bessemer City,* 470 U.S. 564, 572 (1985) ("We
are . . . aware of the potential for overreaching and exaggeration on the part of [prevailing]
attorneys preparing findings of fact" but "even when the trial judge adopts proposed findings
verbatim, the findings are those of the court and may be reversed only if clearly erroneous.");
*Aiken Cnty. v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 677 (4th Cir. 1989) (finding that the
trial court's extensive use of the prevailing parties' findings of fact, while less than ideal, was
acceptable; noting the record illustrated that the findings represent the judge's own considered
conclusions).  Here, the trial court specifically stated that it had reviewed father's proposed facts
and adopted them as its own when deciding the final order.  The presumption that an order
"accurately reflects what transpired," *Stamper v. Commonwealth*, 220 Va. 260, 280-81 (1979),
heightens the need for precision and fairness in drafting.

IV. The Trial Court Erred in Giving Father the Power and Sole Discretion to Expand Mother's Visitation

Mother objects to the trial court's visitation ruling and to the method in which her visitation—or total lack of visitation—can be "expanded." The trial court ordered:

> It is further ordered that once Father, after consultation with the children's therapists, believes that Mother is appropriate and will not cause harm to the children, he may expand Mother's visitation with the children to take place in a therapeutic session. If the therapeutic visitation progresses and, after consultation with the children's therapist(s), Father believes that Mother is appropriate and will not cause harm to the children, Father has the sole discretion to consent to supervised visitation between the Mother and children with a supervisor of Father's choice. Mother shall solely bear the cost of all the therapeutic and the supervised visitation.

We agree with mother that the trial court erred in granting father the power to determine mother's visitation with her children.

A. The Trial Court Has the Exclusive Power to Determine Contested Custody and Visitation Issues

To determine whether the circuit court has the statutory authority to grant a parent the sole discretion, and power, to make visitation determinations, this Court must look to the plain language of the relevant statutes. *See Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007) ("When the language of a statute is unambiguous, we are bound by the plain meaning of that language.").

Code § 20-124.2(A) provides, in pertinent part, that:

> In any case in which custody or visitation of minor children is at issue, whether in a circuit or district court, *the court shall provide prompt adjudication*, upon due consideration of all the facts, of custody and visitation arrangements, including support and maintenance for the children, prior to other considerations arising in the matter.

(Emphasis added). Code § 20-108 provides that the court may revise and alter a decree concerning care, custody, and maintenance of the children either on petition of one of the

parents, or its own motion. It explains "[t]he intentional withholding of visitation of a child from the other parent without just cause may constitute a material change in circumstances justifying a change of custody in the discretion of the court." Code § 20-108.

Additionally, Code § 20-124.3 provides a list of factors that the circuit court itself "shall consider" in "determining the best interests of a child for purposes of determining custody or visitation arrangements." Code § 20-124.2(D) gives the court the power to "order an independent mental health or psychological evaluation *to assist* the court in its determination of the best interests of the child." (Emphasis added). This statutory scheme does not authorize the court to cede its decision-making function to one parent or the other.

### B. The Trial Court Cannot Abdicate Its Judicial Decision-Making to Father

By granting father "sole discretion to consent to supervised visitation between the Mother and children with a supervisor of Father's choice" if "Father believes that Mother is appropriate and will not cause harm to the children," the trial court has abdicated its statutory power, and duty, to determine visitation under Code § 20-124.2(A). The trial court has also limited its own ability to provide for modification of the decree under Code § 20-108 if father withholds visitation, as father arguably cannot withhold something that is in his sole discretion to give.

The Supreme Court of Virginia has previously determined that:

> A court of equity cannot abdicate its authority or powers, nor confide nor surrender absolutely to anyone the performance of any of its judicial functions. It may rightfully avail itself of the eyes and arms of its assistants in the proper preparation for judicial determination of the many complicated, difficult, and intricate matters upon which its judgment is invoked, but in it resides the authority, and to it solely belongs the responsibility, to adjudicate them.

*Raiford v. Raiford*, 193 Va. 221, 230 (1952) (quoting *Shipman v. Fletcher*, 91 Va. 473, 478 (1895)). Ultimately, it is the trial court that "must review the evidence, apply the correct principles of law, and make its own conclusions as to the appropriate relief required." *Benzine v.*

- 17 -

*Benzine*, 52 Va. App. 256, 261 (2008) (quoting *Morrill v. Morrill*, 45 Va. App. 709, 714 (2005) (*en banc*)).

### 1. Virginia Courts Cannot Delegate Judicial Power to Third Parties in Contested Visitation Matters

This Court, in a series of relatively recent unpublished child custody and visitation opinions, has declined to permit judicial delegation of decision-making functions to a third party, such as a guardian *ad litem* or counselor.[6] *See Reilly v. Reilly*, No. 1369-15-2 (Va. Ct. App. Dec. 13, 2016) (deciding it was erroneous for the lower court to give a guardian *ad litem* power to decide visitation); *Bonhotel v. Watts*, No. 0040-16-3 (Va. Ct. App. Dec. 6, 2016) (holding that judges cannot delegate judicial decision-making power in child custody cases to an outside professional); *Padula-Wilson v. Wilson*, No. 1203-14-2 (Va. Ct. App. Apr. 14, 2015) (finding error where the circuit court gave a third-party psychologist complete discretion to decide visitation).

In *Reilly*, the circuit court entered a final order that gave the mother supervised visitation with a goal of getting mother to unsupervised visitation. No. 1369-15-2, slip op. at 12. It ordered "[s]upervision can be altered IN WRITING by the Guardian *ad Litem* based upon

---

[6] We recognize that unpublished opinions are rarely discussed in opinions of this Court. Here, various unpublished opinions were relied upon by the parties because of the limited published Virginia case law on this subject. *Mitchell v. Commonwealth*, 73 Va. App. 234, 248 n.9 (2021) ("Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." (quoting *Blowe v. Commonwealth*, 72 Va. App. 457, 468 n.10 (2020))). Several law review articles also address the topic of judicial delegation in domestic matters in Virginia. *See* Dale Margolin Cecka, *Improper Delegation of Judicial Authority in Child Custody Cases: Finally Overturned*, 52 U. Rich. L. Rev. 181 (2017) (critiquing the practice of lower courts delegating judicial duties in child custody and visitation cases); Elizabeth R. Ellis, *Whose Role Is It Anyway? Deciphering the Role, Functions, and Responsibilities of Representing Children in Custody Matters*, 31 J. Am. Acad. Matrim. Law 533, 557 (2019) (noting the "unfortunate" frequency with which trial courts delegate judicial discretion in visitation decisions to a guardian *ad litem*). We will discuss several unpublished opinions here to provide context and clarify an issue that takes many forms and occurs with some frequency.

Mother's strict compliance with the conditions . . . in this Order." *Id*. On appeal, this Court explained that the lower court had the power of determining visitation and it could not abdicate its power. *Id*. It found it was error for the circuit court to approve the language allowing the guardian *ad litem* total discretion "without providing judicial review because it is inconsistent with the language and purpose of Code § 20-124.2." *Id*., slip op. at 12-13. This Court held "the circuit court cannot delegate to a guardian *ad litem* the authority to unilaterally alter visitation as it did here." *Id*., slip op. at 13.

In *Padula-Wilson*, the circuit court transferred physical custody to the father and provided that the mother could continue to have visitation based on the recommendations of one of the psychologists in the case. No. 1203-14-2., slip op. at 2. It gave the mother unsupervised visitation only when a third-party psychologist determined it was in the best interest of the children. *Id*., slip op. at 23. A subsequent order gave the father sole legal and physical custody and allowed the mother supervised visitation. *Id*., slip op. at 2. This Court looked at the plain language of Code § 20-124.2 and found "[b]ased upon [its] plain language . . . and the established principle that the responsibility to adjudicate cases resides with the judiciary, it was error for the circuit court to order third parties to have complete discretion to decide the mother's visitation without providing for any judicial review of their decisions." *Id*., slip op. at 24-25. On appeal, this Court instructed the circuit court to "make the ultimate custody and visitation determinations" and cautioned it not to "delegate its judicial duty to adjudicate visitation." *Id*., slip op. at 26.

## 2. Delegation of Judicial Decision-Making to a Party in a Contested Visitation Matter is Similarly Unauthorized

Father attempts to distinguish *O'Reilly* and *Padula-Wilson* by noting that he is a party to the case, not a third party.[7] However, father fails to provide any statutory authority for the proposition that a trial court can delegate its decision-making authority exclusively to one parent.

The Virginia Code gives judges, only, the power and responsibility to make rulings in contested custody and visitation matters. Other jurisdictions have come to similar conclusions in analyzing judicial delegation of visitation decisions. *See In re Justin D*, 745 A.2d 408, 417-18 (Md. 2000) (discussing with approval the argument that giving one parent complete discretion in visitation decisions amounts to an improper delegation of judicial authority); *Pratt v. Pratt*, 56 So. 3d 638, 643 (Ala. Civ. App. 2010) ("[A] visitation order awarding 'reasonable visitation with the minor children at the discretion of the [custodial parent]' generally should not be allowed because it authorizes the custodial parent to deny visitation altogether, which would not be in the best interests of the children."); *In re T.H.*, 119 Cal. Rptr. 3d 1, 3 (Cal. Ct. App. 2010) (finding an unauthorized delegation of judicial power where the mother was left with nearly sole power to determine visitation); *In re Izrael J.*, 51 N.Y.S.3d 88, 89 (N.Y. App. Div. 2017) ("A court may not delegate its authority to determine visitation to either a parent or a child."). Where the

---

[7] Father's argument is correct up to a point-in that there are concerns in delegating power to third parties that may not arise where power has been delegated to a parent. *See Bonhotel*, No. 0040-16-3, slip op. at 6-8 (finding that requiring the parents to comply with a counselor's decisions can impinge upon parenting rights protected by the Due Process Clause of the Fourteenth Amendment); *see L.F. v. Breit*, 285 Va. 163, 182 (2013) (recognizing that a parent's relationship with their child is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000))).

governing statutes squarely place the obligation to make contested visitation decisions on the judiciary, delegation of this responsibility to third parties or parents is unauthorized.[8]

Moreover, from a practical standpoint, there are obvious problems inherent in delegating judicial decision-making functions to a party. First, particularly in child custody and visitation cases, parties are likely to have difficulty communicating and seeing past their inherent biases. Leaving the sole power of increased visitation with such a party invites abuse and inequity.[9]

This case aptly illustrates the complications that can arise when one parent is given power over visitation for the non-custodial parent. From the time the JDR court delegated its power to determine visitation to father, giving him sole control over visitation since July 3, 2019, the children have not been permitted to see mother—not even in a therapists' office, let alone in a non-therapeutic setting.[10]

---

[8] By contrast, it is appropriate for the court to consider the opinion of a qualified third party in making visitation determinations. Code § 20-124.2(D); *see Vechery v. Cottet-Moine*, No. 0636-20-4, slip. op. at 5-7, 15-16 (Va. Ct. App. June 15, 2021) (finding that it was not error where the circuit court ordered father, who had a history of stalking his child and assaulting her mother, to attend therapy and indicated that if the therapist determined father had made significant progress, the judge would consider it as a material change in circumstances upon father's petition to resume visitation. The court retained the authority to decide visitation.); *see also Higgins v. Pearce*, No. 1965-16-2, slip. op. at 10 (Va. Ct. App. Nov. 28, 2017) ("A trial court does not abdicate its authority by merely ordering the parties to consider a GAL's recommendation or plan.").

[9] We note that this decision should not be interpreted as prohibiting courts from ordering parties to determine visitation issues jointly, by agreement. This widespread, beneficial practice is distinguishable from a case such as this, because an agreement by the parties does not raise an issue for adjudication as contemplated by Code § 20-124.2(A).

[10] While the counselors fear unmonitored and "non-therapeutic" contact with mother might undercut the children's relationship with father, they also confirm that reunification with father is successfully resolved. Meanwhile, mother and the children have not been permitted to be in the same room since July 2019. Virginia recognizes the importance of permitting contact with *both* parents, as reflected in Code § 20-124.2(B); it requires that the court "assure minor children of frequent and continuing contact with both parents, when appropriate"; this is also demonstrated in Code § 20-108, which explains that intentional withholding of visitation may be considered a change in circumstances in a custody determination.

Finally, under the order, father has been tasked with determining when mother's behavior is "appropriate" and will not "harm" the children. Father has no apparent training in psychology, or any area which would allow him to make such clinical determinations. Therefore, father is either given the power to make an uneducated decision by himself, or encouraged to defer to a trained professional to make the determination. The latter is, in essence, a round-about way of impermissibly delegating judicial power to a third party.

### 3. Visitation Should be Addressed by the Trial Court in its Initial Adjudication—the Fact that a Parent can Seek Future Modification Does Not Render a Court's Abdication of Power Appropriate

Father argues that the trial court's ruling does not foreclose mother from filing for increased visitation in the future and therefore, he does not have true veto power over visitation. It is correct that, under Code § 20-108, the parties and the court retain the ability to modify visitation with minor children in the future. This statute is an avenue for the non-custodial parent to seek increased visitation in the event the custodial parent is not accommodating. Father reasons that since the non-custodial parent is free to move for modification of visitation even after the court has delegated its power to the other parent, the court still retains decision-making power and the delegation is, therefore, appropriate. We conclude the theoretical availability of this possible future relief does not justify the initial, impermissible delegation of power.

Forcing a non-custodial parent such as mother to exhaust more time and resources to relitigate and establish a future change in circumstances under Code § 20-108 (while losing additional time with her children) is not effective or equitable relief for a party who was entitled to judicial resolution of visitation in the first place. Similarly, the *Padula-Wilson* and *Reilly* decisions did not rely on the future availability of Code § 20-108 relief to uphold wrongly delegated third-party visitation awards. Instead, the decisions remedied the improper abdication of judicial power by remand, as we do here.

- 22 -

On remand the trial court, itself, should make the ultimate visitation determinations, assuming the parties cannot agree on them.

## V. The Trial Court Did Not Abuse its Discretion in Granting Father Sole Legal and Physical Custody

Mother argues that the trial court erred in giving father sole legal and physical custody of the children and leaving her with no parenting time[11]; she asserts father did not present sufficient credible evidence to warrant this finding and it is not in the children's best interest.

The trial court heard two days of evidence. This included testimony from mother and father, grandmother, the owner of the gymnastics facility daughter attended, family friends and neighbors, and several doctors and/or counselors. The doctors, therapists, and counselors involved in the reunification with father testified favorably to father. Dr. Nelson, in particular, opined that father had met his goals and had improved his parenting. She explained that mother was a primary parent for years, and Dr. Nelson thought it was in the best interest of the children to have a goal of a healthy relationship with mother. No one has ever suggested that mother was not a good parent during the years she provided care for her children prior to her consenting to the July 2019 reunification with father. But Dr. Nelson noted that mother has anger toward the professionals in the case and toward father. Dr. Nelson also testified that mother felt very strongly that she complied with the order by writing letters, even though the letters were not received by the children through the counseling channels. Mother also felt that she should not have to do the letter writing at all. Overall, Dr. Nelson testified consistently with her reports and thought there could be harm to the children, particularly to their repaired relationship with father, if mother were to have unsupervised contact with them; she remained adamantly supportive of

---

[11] Code § 20-124.2(B)(1) provides that "the court may, in its discretion, use the phrase 'parenting time' to be synonymous with the term 'visitation.'" We have already reversed the mechanics of the visitation ruling and that decision should be revisited on remand. We address only the custody ruling here.

- 23 -

the therapeutic letter writing process and felt that mother's failure to participate in this process was troubling. The trial court, too, echoed concerns about mother's unwillingness to write letters through the therapeutic screening process.

Most importantly, there is evidence that the children are doing well living with father. In fact, testimony confirmed that the reunification process has now been successfully resolved and the once-damaged relationship with father has been repaired. Just the same, the uncontradicted evidence was that the children miss mother terribly and that their own stated preference would be shared time between both parents.

In sum, it was not error for the trial court to find that the testimony of Dr. Nelson and other professionals who treated the Rainey family was credible and persuasive. The written order makes detailed findings of fact and incorporates the recommendations of the mental health professionals as to custody. It is not the function of this Court to substitute its views for that of the trial court, even if we might have viewed the evidence differently. *Bedell*, 70 Va. App. at 504.

### VI. <u>Father's Request for Attorney Fees is Denied</u>

Father asks this Court to award attorney fees and costs, alleging the appeal is frivolous. On appeal, this Court may award all or part of the fees requested. Rule 5A:30(b)(1)-(2). "The appellate court has the opportunity to view the record in its entirety and determine whether [an] appeal is frivolous or whether other reasons exist for requiring additional payment." *O'Loughlin v. O'Loughlin*, 23 Va. App. 690, 695 (1996). "In determining whether to make such an award, [this Court] shall not be limited to a consideration of whether a party's position on an issue was frivolous or lacked substantial merit but shall consider all the equities of the case." Rule 5A:30(b)(3). Mother's appeal was not frivolous, and there is no basis in the record for this Court to award attorney fees to father. Each party shall bear its own fees and costs.

CONCLUSION

The trial court erred in giving father the power to determine mother's visitation. We reverse the trial court's ruling on visitation and remand the case for full review of that issue. We otherwise affirm the final custody and visitation order.

*Affirmed in part, reversed in part and remanded.*