# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, O'Brien and Lorish
Argued at Lexington, Virginia


DAVID LEE O'QUINN

v.        Record No. 2029-23-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE RANDOLPH A. BEALES
JUNE 17, 2025


FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Timothy W. Allen, Judge

James C. Martin (Martin & Martin Law Firm, on brief), for
appellant.

Rachel A. Glines, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Pittsylvania County convicted David Lee

O'Quinn of one felony count of statutory burglary, in violation of Code § 18.2-91, one

misdemeanor count of attempted petit larceny of an automobile, in violation of Code §§ 18.2-26

and 18.2-96, one misdemeanor count of petit larceny, in violation of Code § 18.2-96, and one

misdemeanor count of property damage, in violation of Code § 18.2-137.  On appeal, O'Quinn

challenges the trial court's denial of his motion to suppress statements he made during a police

interview.  He also challenges the trial court's decision to allow the Commonwealth to amend his

indictment for statutory burglary, as well as the trial court's refusal to give his proffered jury

instruction on consent.  In addition, O'Quinn challenges the sufficiency of the evidence to

sustain his conviction for statutory burglary—as well as the trial court's finding that the burglary

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

occurred at a "dwelling house" within the meaning of Code § 18.2-91.  For the reasons that follow, we affirm the trial court's judgment.

## I.  BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).  "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'"  *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

### A.  The Evidence Presented at Trial

Jack Lewis testified at trial that he previously owned the property on Old Richmond Road in Pittsylvania County, Virginia, which included "a brick house," "a white house," and "a little storage building and shed."  He noted that the "brick two-story house" was "built in 1955" and that he "grew up in" that house, and that the "white frame house" was "built somewhere in the 20's" and later "became part of the property" around 1959.  In addition, "there were three vehicles" parked outside on the property, including "a farm use late '90's model Ford F250 truck," "a 2003 GMC Yukon XL," and "a late '80's model Ford Ranger pickup."

In November 2014, Jack Lewis transferred his title in the property to his son, Ben Lewis. Jack Lewis stated that although Ben was primarily in Maryland, Ben also lived in the brick house "off and on from 2018 until" his death in June 2023.  Jack Lewis recounted that he would check on the property "once every week, once every ten days" on average, and that he "had property stored there too."  He recalled that the brick house contained

> a lot of my son's possession, clothes, shoes, a number of file
> cabinets, furniture, computers.  He had a small little office set up.

- 2 -

He had a room that had a, a futon in it. There were, upstairs in the house there was more stuff that was stored. There w[ere] alcoholic beverages up there in a room upstairs in the hallway. Assorted household furniture on the main floor. More furniture, a small little office set up in one bedroom. One bedroom was fairly empty. The formal living room was full of boxes, storage type stuff, tools, sporting goods equipment, a number of pictures and framed artwork, things that were there. And then in the basement, an assortment of tools, bench type woodworking tools and some more wine stored in the basement.

Jack Lewis noted that Ben also kept "a number of challenge coins" from "both his service as a law enforcement officer and with the Marines" in the brick house, as well as "badges and a lot of personal things, jewelry that were related to that" service.

Jack Lewis testified that on March 19, 2022, his "younger sister sent [him] a text message that one of the neighbors had contacted her about a problem that they thought might have existed there" at the property. He noted that he had last been at the property "[s]omewhere probably within the previous ten days."[1] He then went to check on the property and initially noticed that the "door had been ripped off" the "smokehouse and shelter." Jack Lewis went on to recount:

I then went to the brick house and upon opening the side door to the house which had previously been locked with a deadbolt lock, it was not locked. I found a tremendous pile of property in the room adjacent to that door, an assortment of clothes and boxes and tools and a rifle and pictures, a computer monitor and just a big mass of stuff which I knew wasn't there, that, that wasn't where it belonged.

After notifying the police, Jack Lewis "made a walk around the house and found a window on the back side of the property, a casement window that had been knocked out that went into the basement of the house." He also found "a pile of stuff left for somebody to come back and get,"

---

[1] Jack Lewis also noted that his son Ben "had not been at that property since the previous September when he left," although "[h]e came home for a few days around Christmas of 2021." Ben was also "in Pittsylvania County after July of 2022."

and he noticed that "the doorway entrance from the back porch into the kitchen was pretty much obstructed with stuff piled up there."

Jack Lewis further testified that after discovering the break-in, he spoke to his son Ben "several times to tell him what had occurred at the property" and what "was missing."[2] David Lee O'Quinn was arrested soon thereafter, and he was charged with statutory burglary, grand larceny of an automobile, petit larceny, and property damage. Jack Lewis recalled that "after an arrest was made," he told Ben "who had been arrested and asked him did he know this person and he said he did not." Jack Lewis also sent his son "a picture on a text message" of O'Quinn from "a public domain site," and he noted that Ben "told me he didn't know him." Jack Lewis further maintained that he also did not know O'Quinn before the burglary—and that he had never personally allowed O'Quinn onto the property or to use the vehicles on the property.

Deputy Sheriff K.D. Hendrix of the Pittsylvania County Sheriff's Office testified at trial that on March 19, 2022, she went to the Lewis property to investigate "[a] break-in" after receiving a call that "a military duffle bag was found near the driveway of a neighbor's house."[3] Deputy Hendrix stated that the brick house "had been broken" into and that there were "stash piles" outside of items "set up for someone to come back for," such as "catalytic converters" and pieces of metal. She also found "broken glass, things like that, some cigarette butts, an empty cigarette pack, shoes, or a shoe." In addition, she noted that it looked like "somebody tried to jumpstart" a "big SUV" that was sitting there on the property.

---

[2] Jack Lewis stated that the stolen items included two "commemorative bottles made by the Jack Daniels distillery commemorating the Gold Medal award in the year 1981," "some other bottles," "some commemorative coins," and "a bunch of keys that were in a bag along with some sheriff's department badges and a police badge."

[3] Sergeant M.A. Szelc of the Pittsylvania County Sheriff's Office testified at trial that he and his police K-9 Ellie found "a duffle bag" that "belonged to the residence."

Investigator J.E. Turner of the Pittsylvania County Sheriff's Office testified at trial that he investigated the burglary and photographed the crime scene.[4]  He recalled that after looking at the GMC Yukon XL that was parked on the Lewis property, "it was obvious that there was damage to the driver's side window which was busted out, and there was an ax around the vehicle or inside the vehicle."  He also recalled that the side door of the brick house "looked to be open" and that "[t]here was also damage to the basement window that was around back."  Investigator Turner stated that he collected "a cigarette butt that was located beside the passenger side of the Ford that was located in the back of the house," and he then submitted it to the Department of Forensic Science for further testing.[5]  He also noted that he spoke to Jack Lewis about the items found in the "military style green bag" and that Jack Lewis indicated "that it came from the house."

Investigator Turner further testified that he interviewed O'Quinn at the police station on March 23, 2022, about the burglary and other recent theft incidents.  The interview was captured on Investigator Turner's body-worn camera.[6]  At the beginning of the interview, Investigator Turner read O'Quinn his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and O'Quinn then signed and initialed a form waiving his rights.  When questioned whether he had been inside any house on the same block as the Lewis property, O'Quinn initially denied having

---

[4] The Commonwealth introduced into evidence 129 photographs taken by Investigator Turner of the crime scene, all of which were admitted at trial.

[5] Yelitza Rivera, a forensic scientist with the Department of Forensic Science, testified that she performed DNA analysis on a Lucky Brand cigarette butt that was found beside the passenger-side tire of a vehicle on the Lewis property.  Rivera concluded that O'Quinn "cannot be eliminated as a contributor of this DNA profile" and that "[t]he probability of randomly selecting an unrelated individual with a DNA profile matching that developed from the Lucky cigarette butt beside passenger tire . . . is 1 in greater than 7.2 billion (which is approximately the world population)."

[6] The Commonwealth introduced into evidence a series of videos from Investigator Turner's body-worn camera that captured his interview with O'Quinn.

done so.  He then clarified that he had "looked in" a house and had seen "household items," but he maintained that he "didn't take anything."  O'Quinn explained that it "looked like someone had ransacked the place and stole everything," but that he was not the culprit.  He then stated that he took off his wet clothes and put on some dry clothes that "were right there" outside the house.

Over the course of the interview, O'Quinn eventually acknowledged that he "might've sat in a truck right there when it was raining" and that he had tried to jump start an SUV by using a screwdriver.  However, he claimed that the driver's side window of the SUV had already been "busted," that the vehicle's damaged ignition "was already like that," that a jump starter battery to the vehicle "was already attached like that," and that he "didn't take nothing."  He maintained that he was there "[f]or a few hours."  O'Quinn later admitted that he actually "went inside the house," where he "got some clothes," he "took a drink" of "somebody's liquor," and he looked at an Apple computer screen but did not take it.[7]  He claimed that "[t]he door was open" when he entered the house, that he "was by myself" in the house, and that he was only there for "30 minutes, an hour."  O'Quinn noted that he later left the property on a bicycle that was outside the house and that he gave the bicycle to a child "just the other day" near his friend Carolyn Phelps's house.  In addition, when asked where he stayed after he was released from jail on bond on March 14, 2022, he stated that he stayed at "a hotel once or twice" and "at Carolyn's primarily."[8]

After the Commonwealth presented its evidence, O'Quinn's counsel moved to strike the charges.  Addressing the statutory burglary charge, counsel for O'Quinn conceded that the brick house "is a building permanently affixed to realty," but he argued that the phrase "dwelling

---

[7] O'Quinn later admitted that the pants he was wearing during the police interview actually came from the house and that he had not purchased them from Wal-Mart as he had originally told Investigator Turner.

[8] At trial, the parties stipulated that O'Quinn had been arrested on an unrelated offense on March 11, 2022, and then released from jail on bond on March 14, 2022.

house" should be stricken "from the indictment as to the burglary charge." The trial court subsequently denied O'Quinn's motion to strike.

O'Quinn's father, Darrell O'Quinn, then testified at trial for the defense that after bailing his son out of jail on March 14, 2022, he brought his son to his home in Pittsylvania County, where his son stayed until "the next evening." Darrell O'Quinn stated that his son left the next evening with his son's friend, Jesse Crihfield, who lived in southwest Virginia "[r]ight on the border of Kentucky." He maintained that he did not see his son again for "five or six days."

Crihfield testified at trial that in "the middle of the month" around the "14th, 15th" of March 2022, he picked up O'Quinn from his father's house in Pittsylvania County and drove O'Quinn to Crihfield's mother's house in Clinchco, Virginia, which was "four and a half, almost five hours" away. Crihfield maintained that O'Quinn was "doing repairs" on the home of his mother, Reba Crihfield, and that he saw O'Quinn "[o]ne time" during that week. Crihfield stated that "[s]everal days later," he drove O'Quinn back to "a friend's house" in the Danville area.

O'Quinn testified at trial that he entered "[t]he brick house" "one time before" the burglary on March 19, 2022, but he claimed that he did so between March 2, 2022, which was his birthday, and March 11, 2022, when he was arrested and taken to jail on an unrelated charge. O'Quinn explained that he was in jail for "like three days" until he "got bail" by his father. He stated that he then "went home to my parents' house" in Pittsylvania County before leaving the next day "with my family down there to do the job in [the] southwest part of Virginia, because I needed money." He maintained that he did not return to Pittsylvania County until "a week later" and that he stayed with Carolyn Phelps, with whom he "would hang around" and "do drugs."

O'Quinn further testified that when he entered the brick house, he did so "[t]hrough the front door" and that he was inside the house with several other people—including Carolyn, a man called "Lewis," a man named "Tommy," and "a girl" who "was in the house" already when

they arrived by car. O'Quinn maintained that he "wasn't there long" and that he "looked at the trucks first because the trucks were supposed to be for sale." He claimed that "Lewis" "was supposed to have been the owner" of the three vehicles and that he "thought it was his house."[9] O'Quinn then recounted that he "ended up getting upset" with Carolyn and left by himself on foot. He acknowledged that he ate an apple because "[t]he girl tossed me the apple," that he changed clothes because "[t]he girl handed me some camouflage pants" and "a tee shirt," and that "[e]verybody was drinking liquor." He also acknowledged that he had tried to start the Yukon SUV by using a screwdriver. He maintained, however, that he did not steal anything from the house and that he did not damage any property.

Addressing the police interview with Investigator Turner, O'Quinn testified that he was "intoxicated" with "[d]rugs" after having consumed heroin, Xanax, and Suboxone. He claimed that he was "so high" that he did not even "remember half of the" interview. When asked on cross-examination why he told Investigator Turner that he was alone when he went inside the house, O'Quinn stated that he did so "[p]robably to not be a snitch" and "[b]ecause I was being accused of robbing the place." In addition, when asked about his inability to remember almost any details about being at the house, O'Quinn replied, "I remember being there and I remember the gist and I remember us partying but I don't remember real specific entailed [sic] details like why I left my clothes there" because "I was high." O'Quinn went on to claim that he did not know anything about stolen property being found at Carolyn's house. Finally, O'Quinn acknowledged that he had approximately eight prior felony convictions.

---

[9] When shown a photograph of a man who Jack Lewis had previously identified as his son, Ben Lewis, O'Quinn stated that the photograph looked like a younger version of the man to whom he referred as simply "Lewis." O'Quinn testified that the encounter at the brick house "was the first time I'd met him" and that he "never went back again" to the house. He also noted that he had never seen Jack Lewis before other than "in court."

At the close of the defense's evidence, O'Quinn's counsel renewed his motion to strike the charges, again arguing that the brick house was "clearly not a dwelling house" while conceding that "[i]t is a building permanently affixed to realty." Counsel for O'Quinn also argued that O'Quinn's presence at the house was "a consensual entry under the circumstance that he's described in his testimony" because he was there with "Lewis who turns out was the owner of the house." The trial court subsequently denied O'Quinn's renewed motion to strike, finding that the brick house "certainly is a building permanently affixed to realty" and that "[t]he pictures show that it is a building that was used as a dwelling house at some point in time, and there's, there are items in that house which indicate people used it for a dwelling house."

## B. The Motion to Suppress

Before trial, counsel for O'Quinn moved to suppress the statements O'Quinn made during the police interview on the grounds that O'Quinn "was intoxicated by alcohol and/or drugs at the time" of the interview, so his statements were "thus actually involuntary."

At the suppression hearing, Investigator Turner testified that he interviewed O'Quinn about the burglary and other thefts in the area. Prior to conducting the interview, Investigator Turner read O'Quinn his *Miranda* rights, and O'Quinn then "signed an advice of rights form." Investigator Turner recounted that O'Quinn "was alert," that he "was responsive" to questions, that there was no odor of alcohol, and that he "didn't see any indicators that he was intoxicated." He noted that O'Quinn "did appear tired," so he "asked a few questions to ensure that if, you know, if he did have any signs of intoxication you know, I, I wouldn't proceed further." The Commonwealth then played videos of the interview from Investigator Turner's body-worn camera for the trial court, and the videos were admitted into evidence at the suppression hearing.

O'Quinn testified at the suppression hearing that he "[v]aguely" remembered "bits and pieces" of his interview with Investigator Turner. He noted that he "was a little more coherent"

at the beginning of the interview, but he claimed that "right before they had arrested me," he "was doing Suboxone, heroin, and, and some Xanax's." O'Quinn maintained that he "was high" and that the drugs "hadn't kicked in good yet" until later in the interview, stating, "I could tell it was coming on and I could feel it more and more as it went on." He conceded, however, that he used these drugs "[a]ll the time" and that he never told Investigator Turner that he was under the influence of drugs. In addition, O'Quinn acknowledged that his signature was on the *Miranda* waiver form, but he claimed that he did not "remember actually signing that paper."

After hearing the evidence and argument, the trial judge found that Investigator Turner did not use "any type of coercion," that O'Quinn's will was not "overborne in any way by the officer," and that O'Quinn "freely at that time signed the waiver of rights after understanding it." The judge pointed out that Investigator Turner "was very patient with him and explained" the waiver of rights form to him and that "during the course of the interview the officer really didn't pressure Mr. O'Quinn in any way, shape or form." The trial judge acknowledged that "there were a few times when Mr. O'Quinn looked to be extremely sleepy or ready to go to sleep and he had his head laid against the, or down on the table one time and he did sway a couple of times toward the end, end of the interview." However, the judge found that O'Quinn "was able to listen to the questions" and that he "answered the particular questions in a rational way," giving "particularized answers with particular details to these questions." Having considered "all five of the segments of the interview," "the fact that there was a written waiver of rights that was produced by the Commonwealth," and "the demeanor of the defendant during all of this," the trial court subsequently denied O'Quinn's motion to suppress.

C. The Amendment to the Statutory Burglary Indictment

Four days before the jury trial, the Commonwealth moved to amend O'Quinn's indictment for statutory burglary. O'Quinn's original indictment provided, "On or [a]bout

March 19, 2022, in the County of Pittsylvania, Virginia, DAVID LEE O'QUINN [d]id unlawfully and feloniously break and enter a dwelling house and/or a building permanently affixed to realty belonging to JACK LEWIS, with the intent to commit larceny therein." The Commonwealth sought to replace the words "realty belonging to JACK LEWIS" with the words "realty belonging to another" in the indictment. The attorney for the Commonwealth argued that the amendment to O'Quinn's statutory burglary indictment "does not change the nature of the charge which is that he's gone into the property of someone, that it does not belong to him, and that he does not, we contend, have permission to enter."

Counsel for O'Quinn objected to the proposed amendment, stating that Ben Lewis, not Jack Lewis, owned the property at the time of the burglary and that the brick house had "been unoccupied for about nine years." He also objected "to the wording of the verdict form with the same language." However, when asked by the trial judge whether the Commonwealth's proposed amendment surprised him and whether he was prepared to go forward with the jury trial, counsel for O'Quinn replied, "I, I, well, it did sort of surprise me but I'm not asking for a continuance, you know, I mean you know, I, I hope the Court rules like I want you to rule but if you grant it, I am not going to ask for a continuance." After hearing argument, the trial court granted the Commonwealth's motion to amend the statutory burglary indictment, and the parties went forward with the scheduled jury trial.

### D. The Jury Instruction for Statutory Burglary

Counsel for O'Quinn proffered a jury instruction about "entry gained by consent," which stated:

> THE COURT INSTRUCTS THE JURY THAT in order to prove a breaking and entering of the premises the burden is upon the Commonwealth to prove by the evidence beyond a reasonable doubt that entrance to the premises was contrary to the will of the occupier of the premises. And if you believe from the evidence that the defendant had permission to enter the premises, or if you

- 11 -

have a reasonable doubt as to whether the defendant's entrance was against the will of the occupier of the premises, then you cannot find the defendant guilty of statutory burglary.

O'Quinn's counsel asserted that this proffered jury instruction "was relevant to this case," that "it added something that was important to this case," that it "slightly altered" a model jury instruction "from the 1960's," and that it was "co-written by a guy named Merhige who later became a federal judge." O'Quinn's counsel conceded, however, that the issue of consent was "possibly covered by other instructions." Among the trial court's instructions that were given to the jury, Instruction No. 9 addressed the charge of statutory burglary and stated:

The defendant is charged with the crime of statutory burglary. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:

(1) That the defendant, without permission of the owner or authorized occupant, at any time, broke and entered a building permanently affixed to realty.

(2) That he did so with intent to commit larceny.

If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt each of the above elements of the crime as charged, then you shall find the defendant guilty.

If you find that the Commonwealth has failed to prove beyond a reasonable doubt any one or more of the elements of the crime, then you shall find the defendant not guilty.

Both parties agreed to Instruction No. 9, as well as to the other instructions that were given to the jury. The trial court refused O'Quinn's proffered jury instruction on consent.

E.  The Jury's Verdict

After hearing the evidence and argument, the jury convicted O'Quinn of one felony count of statutory burglary, one misdemeanor count of attempted petit larceny of an automobile, one

misdemeanor count of petit larceny, and one misdemeanor count of property damage.[10]

O'Quinn's counsel then moved to set aside the jury verdict "as contrary to the law and the

evidence for the reasons that I stated in my second motion to strike." The trial court took

O'Quinn's motion under advisement with the agreement of O'Quinn's counsel. However, the

trial court did not formally rule on the motion, and, with the consent of the parties, the trial court

proceeded with sentencing at the later sentencing hearing. O'Quinn now appeals to this Court.

## II. ANALYSIS

### A. The Motion to Suppress

On appeal, O'Quinn argues, "The trial court erred in overruling the motion to suppress

the actually involuntary statements given by the defendant to law enforcement whilst he was

intoxicated by alcohol and/or drugs."

"The defendant has the burden to show that, when viewing the evidence in the light most

favorable to the Commonwealth, the trial court's denial of the motion to suppress was reversible

error." *Sidney v. Commonwealth*, 280 Va. 517, 522 (2010). "We review de novo the trial court's

application of the law to the particular facts of the case." *Branham v. Commonwealth*, 283 Va.

273, 279 (2012). However, we are "bound by the trial court's findings of historical fact unless

'plainly wrong' or without evidence to support them and we give due weight to the inferences

drawn from those facts by resident judges and local law enforcement officers." *McGee v.

Commonwealth*, 25 Va. App. 193, 198 (1997) (*en banc*).

The Supreme Court has stated, "Statements made during a custodial interrogation and

while intoxicated are not *per se* involuntary or inadmissible." *Yarborough v. Commonwealth*,

---

[10] O'Quinn was also convicted of felony grand larceny in a separate bench trial. That grand larceny conviction was not appealed to this Court, so no records related to that conviction were submitted to this Court. There was a single sentencing event for all of O'Quinn's convictions—both from his jury trial and from his later bench trial.

217 Va. 971, 974 (1977). "The test is whether, by reason of the intoxication, the defendant's 'will was overborne' or whether the statements were the 'product of a rational intellect and a free will.'" *Id.* (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)). It is well-established that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.* at 164 (noting that "[e]ven where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause"). However, "[t]he amount of coercion necessary to trigger the due process clause may be lower if the defendant's ability to withstand the coercion is reduced by intoxication, drugs, or pain, but *some* level of coercive police activity must occur before a statement or confession can be said to be involuntary." *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992).

"The test for voluntariness is whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" *Jenkins v. Commonwealth*, 244 Va. 445, 453-54 (1992) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). "When determining whether a defendant's will has been overborne, the totality of the circumstances must be examined, including the defendant's experience and background as well as the conduct of the police." *Id.* at 454. Although "[v]oluntariness is a question of law, subject to independent appellate review," *Midkiff v. Commonwealth*, 250 Va. 262, 268-69 (1995), this Court is bound by "the trial court's subsidiary factual findings unless those findings are plainly wrong," *Wilson v. Commonwealth*, 13 Va. App. 549, 551 (1992). As the Supreme Court has recognized, a trial

- 14 -

court's finding that an accused's "will was not overborne is a factual finding, entitled on appeal to the same weight as a finding by a jury, and will not be disturbed unless plainly wrong." *Bailey v. Commonwealth*, 259 Va. 723, 746 (2000).

In this case, Investigator Turner testified at the suppression hearing that at the beginning of the police interview, O'Quinn was Mirandized and "signed an advice of rights form." Investigator Turner stated that O'Quinn "was alert," that he "was responsive" to questions, that there was no odor of alcohol, and that he "didn't see any indicators that he was intoxicated." Recognizing that O'Quinn "did appear tired," Investigator Turner explained that he even "asked a few questions to ensure that" O'Quinn was not intoxicated at the time of the interview. Although O'Quinn maintained that he "was high" on Suboxone, heroin, and Xanax, he acknowledged that he never told Investigator Turner that he was under the influence of drugs— and he also acknowledged that his signature was on the *Miranda* waiver form.

After observing "all five of the segments of the interview" videos from Investigator Turner's body-worn camera and "the demeanor of the defendant during all of this," the trial judge expressly found that Investigator Turner did not use "any type of coercion," that O'Quinn's will was not "overborne in any way by the officer," and that O'Quinn "freely at that time signed the waiver of rights after understanding it." The trial judge further found that Investigator Turner "was very patient with him [O'Quinn] and explained" the waiver of rights form to him—and that "during the course of the interview the officer really didn't pressure Mr. O'Quinn in any way, shape or form." The trial judge also found that O'Quinn "was able to listen to the questions" and that he "answered the particular questions in a rational way," giving "particularized answers with particular details to these questions."

In short, considering the totality of the circumstances, the record before this Court on appeal establishes that there was no evidence of police coercion during the interview and that

O'Quinn's statements to Investigator Turner were voluntary. Furthermore, the trial court was not plainly wrong in finding that O'Quinn's will was not overborne during the police interview. Consequently, we hold that the trial court did not err in denying O'Quinn's motion to suppress.

### B. The Amendment to the Statutory Burglary Indictment

O'Quinn next argues,

> The trial court erred in allowing the amendment of the statutory burglary indictment to describe a building 'belonging to another' from 'belonging to Jack Lewis'—who had not owned the building since he deeded it in 2014 to the victim named in the original warrant: his late son John Benjamin Lewis who was deceased by the time of the alleged burglary.[11]

A trial court may permit the amendment of an indictment "at any time before the jury returns a verdict," provided that the "amendment does not change the nature or character of the offense charged." Code § 19.2-231. However, if the "trial court finds that such amendment operates as a surprise to the accused, he shall be entitled, upon request, to a continuance of the case for a reasonable time." *Id.* This Court has explained that "an indictment may be amended only if it corrects (1) a defect in form or (2) a variance between the allegations contained in the original indictment and the proof the Commonwealth expects to adduce at trial." *Pompell v. Commonwealth*, 80 Va. App. 474, 481 (2024) (stating that the "function of an indictment is to notify the accused of the nature and character of the accusations before him so that he can adequately prepare a defense"). Indeed, "Code § 19.2-231 is 'remedial in nature and is to be liberally construed in order to achieve the laudable purpose of avoiding further unnecessary delay in the criminal justice process by allowing amendment, rather than requiring reindictment by a grand jury.'" *Id.* at 482 (quoting *Willis v. Commonwealth*, 10 Va. App. 430, 437 (1990)).

---

[11] As noted *supra*, Jack Lewis testified that his son Ben died in June 2023—after the alleged burglary occurred in March 2022 and shortly before O'Quinn's jury trial in August 2023.

Here, the Commonwealth's amendment to O'Quinn's indictment for statutory burglary replaced "belonging to JACK LEWIS" with "belonging to another." The Commonwealth was permitted to amend the indictment to correct "a variance between the allegations contained in the original indictment and the proof the Commonwealth expects to adduce at trial." *Pompell*, 80 Va. App. at 481. Indeed, the evidence adduced at trial established that Jack Lewis's son, Ben Lewis, was the owner of the property at the time of the burglary. Although the amendment changed the owner of the property, the amendment, however, did not change "the nature or character of the offense charged"—as the date of the offense, the location of the offense, and the underlying conduct all remained the same. In addition, to the extent that the amendment may have surprised O'Quinn, his counsel expressly stated to the trial court, "I am not going to ask for a continuance," and his counsel indicated that he was prepared to proceed with the scheduled jury trial. Given the remedial purpose of Code § 19.2-231 and the importance of avoiding unnecessary delay, the trial court did not err here in granting the Commonwealth's motion to amend O'Quinn's indictment for statutory burglary.

### C. The Jury Instruction for Statutory Burglary

O'Quinn also argues, "The trial court erred in refusing a consent instruction which explained that the Commonwealth had to prove beyond a reasonable doubt that the defendant's entry was contrary to the will of the occupier of the property."

It is well established that an appellate court

> review[s] jury instructions to see that the law has been clearly
> stated and that the instructions cover all issues which the evidence
> fairly raises. This is a mixed question of law and fact. It is error to
> give an instruction that incorrectly states the law; whether a jury
> instruction accurately states the relevant law is a question of law
> that we review de novo. However, jury instructions are proper
> only if supported by the evidence, and more than a scintilla of
> evidence is required. When reviewing a trial court's refusal to give
> a proffered jury instruction, we view the evidence in the light most
> favorable to the proponent of the instruction.

- 17 -

*Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (alteration in original) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). As the Supreme Court has recognized, a trial court may nevertheless "exercise its discretion and properly exclude an instruction that both correctly states the law and is supported by the evidence when other granted instructions fully and fairly cover the relevant principle of law." *Id.* (quoting *Payne*, 292 Va. at 869).

In this case, Instruction No. 9 (which was given to the jury and was agreed to by both parties) "fully and fairly" covered the elements of statutory burglary. That jury instruction provided that in order to find O'Quinn guilty of statutory burglary, the jury was required to find "beyond a reasonable doubt" that O'Quinn, "without permission of the owner or authorized occupant, at any time, broke and entered a building permanently affixed to realty" and that "he did so with [the] intent to commit larceny." Indeed, the issue of the owner's or occupier's will and permission was squarely put before the jury. Furthermore, Instruction No. 9 was based on Virginia Criminal Model Jury Instruction No. 12.220, which covers the offense of statutory burglary with the intent to commit larceny or a felony other than murder, rape, robbery, or arson. Given that the granted jury instructions fully and fairly covered the relevant principles of law, we certainly cannot say that the trial court abused its discretion here in denying O'Quinn's proffered jury instruction.

### D. The Sufficiency of the Evidence for the Statutory Burglary Conviction

Finally, O'Quinn argues, "The trial court erred in ruling that the evidence was sufficient to convict the defendant of statutory burglary when the evidence suggested that he had been allowed into the building on the occasion in question by a man fitting the description of the late owner thereof, thus creating a reasonable doubt as to the defendant's burglarious intent and suggesting a consensual entry." He also contends, "The trial court erred in ruling that the

building in question was still a dwelling house when its use as such had been abandoned years before the alleged burglary."

The Supreme Court has stated, "When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). Indeed, "[w]hen reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (second alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). Thus, "[i]f there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." *Clark v. Commonwealth*, 279 Va. 636, 641 (2010) (quoting *Commonwealth v. Jenkins*, 255 Va. 516, 520 (1998)).

Code § 18.2-91 defines statutory burglary as a violation of Code § 18.2-90 "with intent to commit larceny." Code § 18.2-90 provides that "any person" who "in the daytime breaks and enters or enters and conceals himself in a dwelling house or an adjoining, occupied outhouse . . . or at any time breaks and enters or enters and conceals himself in any building permanently affixed to realty . . . shall be deemed guilty of statutory burglary." "Both statutory burglary and common-law burglary are specific-intent crimes in which the Commonwealth has the burden of proving, as an essential element of the crime, that the defendant committed an unlawful entry

- 19 -

with the requisite intent." *Velasquez v. Commonwealth*, 276 Va. 326, 329 (2008). However, "[i]n a prosecution for statutory burglary under Code § 18.2-91, proof that the accused unlawfully entered another's dwelling supports an inference that the entry was made for an unlawful purpose. The specific intent with which the unlawful entry is made may be inferred from the surrounding facts and circumstances." *Breeden v. Commonwealth*, 43 Va. App. 169, 181 (2004) (quoting *Robertson v. Commonwealth*, 31 Va. App. 814, 822 (2000)).

In this case, Jack Lewis testified that when he went to the brick house after being alerted to a potential break-in, he noticed that "upon opening the side door to the house which had previously been locked with a deadbolt lock, it was not locked." He recalled that he then "made a walk around the house and found a window on the back side of the property, a casement window that had been knocked out that went into the basement of the house." Investigator Turner likewise testified that the side door of the brick house "looked to be open" and that "[t]here was also damage to the basement window that was around back." Furthermore, Deputy Hendrix testified that the brick house "had been broken" into and that there were "stash piles" outside of items "set up for someone to come back for" and retrieve. Subsequent forensic testing of a cigarette butt that Investigator Turner collected outside the brick house near a parked vehicle also established that O'Quinn had been at the property.

In addition, Jack Lewis testified that following O'Quinn's arrest for the burglary, he informed his son Ben Lewis about "who had been arrested," and Jack Lewis "asked him did he know this person and he said he did not." Jack Lewis noted that he also sent his son "a picture on a text message" of O'Quinn from "a public domain site"—and that Ben "told me he didn't know him." Jack Lewis stated that he also did not know O'Quinn before the burglary—and that he had never personally allowed O'Quinn onto the property.

During the police interview, O'Quinn eventually admitted to Investigator Turner that he actually "went inside the house," where he "got some clothes," he "took a drink" of "somebody's liquor," and he looked at an Apple computer screen. O'Quinn claimed, however, that "[t]he door was open" when he entered the brick house, that he "was by myself" in the house, and that he was only there for "30 minutes, an hour"—contrary to his testimony at trial. Although O'Quinn later testified that he was on the property with a man called "Lewis" and that he "thought it was his house," the fact finder was certainly "entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Maust v. Commonwealth*, 77 Va. App. 687, 703 (2023) (*en banc*) (quoting *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018)).

In short, we hold that the record before this Court on appeal supports a finding that O'Quinn broke into and unlawfully entered the brick house without the permission of the owner. O'Quinn's unlawful entry into the brick house supports the reasonable inference that he entered with an unlawful purpose, and the surrounding circumstances, in turn, support a reasonable inference that he entered with an intent to commit larceny. Therefore, we certainly cannot say that the trial court erred in denying O'Quinn's motions to strike—or that the jury, as the finder of fact, was plainly wrong or without credible evidence in finding that O'Quinn committed statutory burglary.

To the extent that O'Quinn challenges whether the brick house was a "dwelling house," the Supreme Court has "defined a 'dwelling house' for purposes of the burglary statutes as 'a house that one uses for habitation, as opposed to another purpose.'" *Grimes v. Commonwealth*, 288 Va. 314, 317 (2014) (quoting *Giles v. Commonwealth*, 277 Va. 369, 375 (2009)). The Supreme Court has stated:

> [A] house is a dwelling house pursuant to Code § 18.2-89 when the house is used for habitation, including periodic habitation.

> Periodic habitation does not require that the house be used at regular intervals. Rather, periodic habitation requires that when the house is used, it is used for the purpose of habitation. Thus, a dwelling house is a house that one uses for habitation, as opposed to another purpose.
>
> Although the Commonwealth is not required to prove a structure is inhabited at regular intervals, it must provide sufficient evidence that the structure is used as a habitation to satisfy the "dwelling house" requirement of Code § 18.2-89.

*Giles*, 277 Va. at 375. This Court has found that the meaning of "dwelling house" is "the same for all three" burglary statutes, including Code §§ 18.2-89, 18.2-90, and 18.2-91 (the statute referenced in O'Quinn's indictment and in the trial court's final sentencing order). *Johns v. Commonwealth*, 53 Va. App. 742, 746 n.2 (2009).

Jack Lewis testified at trial that his son Ben lived in the brick house "off and on from 2018 until" his death in June 2023, although Ben was primarily living in Maryland during much of that time. He noted that Ben kept "clothes, shoes, a number of file cabinets, furniture, computers," and other possessions in the brick house. Jack Lewis also noted that Ben "had a small little office set up" in the brick house, that one room in the house had "a futon in it," and that the other rooms contained "[a]ssorted household furniture" and additional personal items that Ben kept in the house—including "a number of challenge coins" from "both his service as a law enforcement officer and with the Marines," as well as "badges and a lot of personal things, jewelry that were related to that" service. Jack Lewis explained that he would check on the property "once every week, once every ten days" on average—and that he even grew up in the brick house. Given this uncontroverted evidence that the brick house was used for periodic habitation, the record before this Court on appeal supports a finding that the brick house was a "dwelling house" within the meaning of the burglary statutes.[12]

---

[12] Regardless, counsel for O'Quinn conceded before the trial court that the brick house that was broken into is a "building permanently affixed to realty," Code § 18.2-90, which could

### III.  CONCLUSION

For all of the foregoing reasons, we affirm the trial court's judgment, and we do not disturb O'Quinn's convictions.

*Affirmed.*

---

also satisfy the necessary requirement for a conviction of statutory burglary with the intent to commit larceny under Code § 18.2-91 now before us here.